**2024 UT App 87**

# THE UTAH COURT OF APPEALS

TKS Co-Pack Manufacturing, LLC and Troy Wilson,
Appellants and Cross-appellees,

*v.*

Doug Wilson,
Appellee and Cross-appellant.

Opinion
No. 20210855-CA
Filed June 6, 2024

Fourth District Court, Provo Department
The Honorable Robert A. Lund
The Honorable James R. Taylor
No. 200401547

Michael D. Stanger, Scarlet R. Smith, and R. Jesse
Davis, Attorneys for Appellants and Cross-appellees

Brady Brammer and Brenton Ranck, Attorneys for
Appellee and Cross-appellant,
assisted by law student Annie Carmack[1]

JUDGE JOHN D. LUTHY authored this Opinion, in which JUDGES
GREGORY K. ORME and RYAN M. HARRIS concurred, with the
exception of Part II.B.2.b. JUDGE HARRIS authored a separate
opinion regarding Part II.B.2.b, which JUDGE ORME joined.

LUTHY, Judge:

¶1      This opinion addresses a number of issues related to civil
stalking injunctions. It also addresses the requirements for
judgments as set forth in rule 58A of the Utah Rules of Civil
Procedure and the range of discretion given to district courts
when deciding whether voluntary dismissal under rule 41(a) of

---

1. *See* Utah R. Jud. Admin. 14-807 (governing law student practice
in the courts of Utah).

the Utah Rules of Civil Procedure should be granted with or without prejudice.

¶2 Troy Wilson is the president and co-owner of TKS Co-Pack Manufacturing, LLC (TKS). He hired his brother Doug Wilson to work at TKS. After a time, Doug[2] left TKS. Subsequently, Troy and TKS (collectively, the TKS parties) filed a complaint against Doug, which contained several tort claims as well as a request for a civil stalking injunction. With their complaint, the TKS parties also filed a motion for an ex parte civil stalking injunction, an ex parte temporary restraining order, and a preliminary injunction. The district court granted a temporary stalking injunction, and Doug then filed an answer and counterclaims. Doug later asked that his counterclaims be dismissed, and they were dismissed without prejudice.

¶3 After an evidentiary hearing, the district court issued a permanent civil stalking injunction (the Stalking Injunction) against Doug and in favor of Troy. The Stalking Injunction also protected "[a]ny customer of TKS" and "[a]ny employees of TKS." Subsequently, Doug posted on Facebook about the Stalking Injunction and communicated with a prior TKS customer (Prior Customer). The TKS parties then filed a motion requesting that Doug be held in contempt for violating the Stalking Injunction. The district court held another evidentiary hearing, applied the standard for criminal contempt, found that Troy had not established the alleged violations beyond a reasonable doubt, and denied Troy's motion.

¶4 In the meantime, the TKS parties had also moved to dismiss their tort claims without prejudice. Doug opposed the motion and moved for dismissal of the claims with prejudice. The court dismissed the tort claims without prejudice.

---

2. Because the parties share a surname, we use their given names, with no disrespect intended by the apparent informality.

¶5     The TKS parties appeal the district court's decision not to hold Doug in contempt. Doug also appeals, asserting that the Stalking Injunction was not properly granted in the first place and that the district court erred by dismissing the TKS parties' tort claims without prejudice.[3]

¶6     As to Doug's appeal, we conclude that the district court did not err in issuing the Stalking Injunction and that the court did not abuse its discretion in dismissing the TKS parties' tort claims without prejudice. As to the TKS parties' appeal, we unanimously affirm the district court's determinations to apply the criminal standard in the contempt proceedings and to not hold Doug in contempt for communicating with Prior Customer. Additionally, based on Judge Harris's separate opinion, which is joined by Judge Orme, we also affirm the district court's determination to not hold Doug in contempt based on the allegation that his Facebook post and related comments violated the Stalking Injunction.

BACKGROUND

*Pre-litigation History*

¶7     Troy offered Doug, who was then living in California, a job at TKS, a business in which Troy held a 50% interest. Doug moved to Utah and began working at TKS as a production manager. After about a year and a half, Doug left TKS in mid-2020. Following Doug's departure, Troy received reports from TKS employees that Doug had allegedly behaved inappropriately toward multiple employees while he worked there.

---

3. As explained in more detail below, although Doug's appeal has been designated as a cross-appeal for ease of reference, the two appeals in this matter are separate and distinct appeals. *See infra* note 5.

¶8 Doug then began working for TKS's landlord (Landlord), a company that had its office in the same building as TKS. In his new role, Doug continued to have interactions with TKS employees that the TKS parties believed were harassment. Thus, Troy emailed Landlord to request that it appoint another of its employees as a point of contact for TKS. TKS also terminated the employment of several of its employees who it believed were attempting to sabotage TKS at Doug's request.

*The TKS Parties' Complaint*

¶9 In October 2020, the TKS parties filed a complaint against Doug, requesting a civil stalking injunction and asserting seven tort claims: tortious interference with employment relationships, tortious interference with customer relationships, tortious interference with government relationships, tortious interference with the landlord-tenant relationship, defamation, tortious infliction of emotional distress, and trespass. The TKS parties alleged, among other things, that after Doug left TKS, he had

- driven a forklift "into TKS's roll up door";

- convinced several TKS employees to help him fabricate safety violations by TKS by doing such things as staging pictures to make it look like TKS was violating workplace safety regulations;

- convinced several TKS employees to sabotage TKS by doing such things as putting "grease on a brand new filter that was being used in production";

- attempted to falsely "blow the whistle" on TKS by reporting that TKS was transporting CBD without a permit when TKS had such a permit;

- persuaded Landlord that TKS "was dumping paint and other toxic items into the sewer," resulting in Landlord

terminating TKS's lease and then reinstating it after another company was identified as the source of the dumping; and

- continued to harass TKS employees by confronting them for speeding and using a roundabout improperly, "overzealously monitor[ing]" them, "sexually harass[ing] female employees, both on site . . . and via text and phone," and telling "an employee of TKS that he now knows 'why Cain killed Abel.'"

The TKS parties asserted that "[t]hese actions by Doug [had] caused Troy and other employees of TKS to fear for their safety and alter their commuting patterns in an attempt to avoid a confrontation with Doug."

*Temporary Civil Stalking Injunction*

¶10 With their complaint, the TKS parties also filed a motion for an ex parte civil stalking injunction, an ex parte temporary restraining order, and a preliminary injunction. In that motion, the TKS parties alleged many of the details recounted above and requested that the district court "issue a stalking injunction against Doug and issue an injunction in the form of a Temporary Restraining Order and preliminary injunction enjoining Doug from having any contact with any TKS employee (including Troy) or customer, and to stay away from Troy's home, and to stay out of TKS's facilities." The district court issued an ex parte civil stalking injunction on October 27, 2020.

*Doug's Suicide Attempt*

¶11 Three days later, Doug attempted suicide, prompting the TKS parties to move to modify the temporary stalking injunction in light of Doug's alleged actions during that episode. Specifically, the TKS parties alleged that Doug had come with a shotgun in his car to the building that housed TKS and Landlord, that he had

gone into the building and left a suicide note, and that he had "then [gone] to the mountains with the intent of taking his own life." The TKS parties further alleged that Doug had "eventually [been] talked out of killing himself, . . . placed in police custody, and then transferred to a hospital." They continued, "After being released from the hospital, Doug has returned to work. This is problematic as Doug and Troy both work in the same building and the [temporary stalking injunction] specifically orders Doug to 'stay away' from Troy's work." The TKS parties explained that law enforcement had "declined" to remove Doug from his workplace because the temporary injunction identified as protected premises "the suite . . . of the building instead of the building itself." Accordingly, the TKS parties sought an amendment that would clarify that the term "'stay away' includes but is not limited to staying away from the building and the parking lot." They also requested "language specifically stating that Doug is prohibited from possessing a firearm."

*Doug's Answer and Counterclaims*

¶12 In November 2020, Doug filed both an answer to the TKS parties' complaint and several counterclaims. He asserted that the allegations against him were based on "speculation and rumors" and that he "was distraught over being accused of sexual misconduct." He also recited the severe impact the allegations were having on his health, job, and marriage. Doug's complaint then recounted Doug's attempt to end his life:

> On October 30, 2020[,] Doug Wilson left a suicide note at his . . . desk [in Landlord's office]. The note read:
>
>> "To my family I love you all with everything I have. I feel like there is no other way out of where Troy has put me. I do not have the will or strength to fight. I have come to the end of the line. Forgive me. I want no funeral and no

> burial. Cremate me and take my ashes anywhere. Kids I love you so much. Everything I own I give to my wife, the house, the belongings, everything."
> —Douglas Wilson.

> He did not have any shotgun at the time he left the note. He left [Landlord's office], obtained a shotgun and went to the mountains with intent to take his own life.

Doug's complaint relayed how he encountered hunters in the mountains, he voluntarily surrendered the gun to them, and they called the police to help him. It further stated that the police had noted, "Douglas believes [his family] would be better off without him because his brother Troy is going to make him lose his job so he can't support them." (Alteration in original.) Doug's complaint then asserted counterclaims of intentional infliction of emotional distress, defamation/libel/slander, interference with economic and employment relations, and wrongful use of civil proceedings. Doug later voluntarily dismissed his counterclaims, purportedly at the behest of his mother. His counterclaims were dismissed without prejudice.

*Permanent Civil Stalking Injunction*

¶13    In December 2020, the district court held an evidentiary hearing on the motion for a civil stalking injunction. After hearing evidence and arguments, the court first identified incidents that it felt did not provide grounds for making the stalking injunction permanent. Specifically, it said that the allegation that Doug left the suicide note with the intent to harm Troy was "extreme" and "unlikely" and that "[t]he placement of the note at [Doug's] work" did not evidence "an intent to direct that note or the activity that was . . . intended toward either . . . [TKS] or [Troy]." The court also said that it did not interpret Doug's reference to Cain and Abel "as a threat to commit bodily harm." And it reasoned that Doug's

efforts to "enforce parking restrictions" were not "necessarily retaliatory toward . . . the company . . . or Troy . . . or directly committed in a way that intended . . . either physical harm or emotional distress to Troy."

¶14 The district court then identified evidence that it felt did support a permanent stalking injunction. It first pointed to conversations that Doug had engaged in with his and Troy's sister (Sister). The court characterized those conversations as Doug communicating, "I will ruin Troy. I will contact customers. I will bring the company down. . . . [T]hey will lose the business. They'll lose everything." The court said, "That's personal, that's harmful; and that evinces an intent to . . . cause emotional distress to a specific person, which is what's required by the statute." The court then pointed to a text message Doug sent to a person (Vendor) who works for another company owned by Troy and is frequently on site for TKS. After Vendor had a conversation with a TKS employee while at the TKS plant, Doug texted Vendor asking what the pair had been talking about. The court observed, "[Doug] create[d] the impression that he's all-knowing, that . . . he sees. He create[d] a sense of unease and discomfort. And that is fearful, and that is emotionally frightening. And that can upset the workings of a company and . . . create a cloud of suspicion and distrust for the company." Finally, the court pointed to a conversation between Doug and Vendor during which Doug "suggested that he was going to go to . . . [a] customer [of TKS] and tell them how their . . . product [was] being handled," which the court said "undermine[d] the wellbeing of the company." The court concluded by saying that these incidents showed that "Doug engaged in this conduct in order to bring . . . [Troy] down" and "in order to cause distress and ruin the company." Based on these incidents, the court said, "[I'm] satisfied to a preponderance that there is a course of action, that it was directed in such a way that although it was aimed at the company, [it] was aimed at the company in a particularly harmful way and that it satisfies the requirements of the stalking [statute]."

¶15    The district court further explained that because it did not consider the suicide-related incident to be part of the "course of conduct" required by the stalking statute, *see generally* Utah Code § 76-5-106.5(2)(a),[4] it was denying the TKS parties' request that the injunction include "the firearms prescription." The court also denied the TKS parties' request that Doug be restricted from the building housing TKS and Landlord's offices. Instead, it clarified that the permanent stalking injunction would restrict Doug from being involved in any direct interactions between Landlord and TKS, from entering TKS's premises within the building, and from acting inappropriately on the surrounding premises, such as repeatedly driving around in circles, hovering, or acting with the intent to intimidate.

¶16    The district court thereafter issued the Stalking Injunction, which did not detail the facts giving rise to its issuance but stated, "For the reasons stated on the record, the Court finds that there is reason to believe that Doug Wilson has stalked Troy Wilson." The Stalking Injunction contained both a "Personal Conduct Order" and a "No Contact Order." The Personal Conduct Order read:

> Doug is not to stalk Troy. This means that Doug must not do things such as follow, threaten, annoy, or harass Troy in a way that could cause a reasonable person to suffer emotional distress or to be afraid for the person's safety or the safety of another person. For a legal definition of stalking, see Utah Code Ann. § 76-5-106.5.

The No Contact Order read:

---

4. The stalking statute was amended after the events relevant to this appeal. *Compare* Utah Code § 76-5-106.5 (2020), *with id.* (2024). Because the changes to the relevant text are mostly minor and do not affect our analysis, we cite the current version of the statute except where the text has materially changed. *See infra* note 9.

> Doug must not contact, phone, text, mail, email, or communicate with, either directly or indirectly in any way with Troy and any other person listed below.

The Stalking Injunction was issued in favor of Troy (not TKS) and listed as additional protected persons Troy's spouse and children, Vendor, three named TKS employees, "[a]ny customer of TKS," and "[a]ny employee of TKS."

*Motion for Contempt Sanctions*

¶17 In March 2021, the TKS parties filed a motion to hold Doug in contempt for violating the Stalking Injunction. The judge who received and adjudicated the contempt motion was not the one who had presided over the proceedings related to the issuance of the temporary stalking injunction and the Stalking Injunction. In their contempt motion, the TKS parties alleged that Doug had violated the Stalking Injunction by making a Facebook post along with subsequent comments related to the post and by communicating with Prior Customer.

¶18 As to the Facebook post, the TKS parties identified a post by "John Dough" that read verbatim:

> I have kept my mouth shut for far to long. I have listened to some of my family member bear false witness against me all in a attempt to cover up wrong doing. Had family members try to hurt me to the point to drive me to take my life. They hoped for it. Being sued because I stood up and talked out. For the first time I am appalled to be part of this family. To have family members turn their backs on me. So Christ like to take one side of a story and make it true. All that evil needs to prevale in this world is that good people do nothing. I am so glad you act like Christians.

In response to comments on this post, "John Dough" also posted two comments:

> There was a law suite filed against me. I have the document. The stalking injunction was filed against me as well in court. [Sister] mislead and lied in court about what was going on and about what was said. This is why I sent out the post in the first place. You have only one side of a truth which is based in lies.

and

> I am just so glad my family has both sides of the story. Oh wait they don't. Thanks for getting my side of the story so you you have all the information.

Doug admitted that he "uses the name John Dough on Facebook."

¶19   As to Doug's communication with Prior Customer, the TKS parties alleged that Doug had informed Prior Customer, "[B]ecause you are a customer of Troy, I am not allowed to talk to you." The motion ended with the TKS parties' request that the court "impose a fine and/or incarceration."

### Dismissal of the TKS Parties' Tort Claims

¶20   By June 2021 and before a hearing on the contempt motion, the parties had engaged in little to no discovery on the TKS parties' tort claims, and the TKS parties moved to voluntarily dismiss those claims, stating, "Having prevailed on their 8th Cause of Action (Civil Stalking), and having been granted [the] Stalking Injunction against Doug . . . , the TKS [p]arties have obtained the primary relief sought and needed to protect Troy, his family and TKS'[s] employees and customers from Doug."

¶21   Doug opposed granting a dismissal of the TKS parties' tort claims without prejudice, and he moved for dismissal of the

claims with prejudice. He contended that the TKS parties never "offered any initial disclosures or proof of the . . . devastating smears on Doug's moral character," that they did not participate in discovery though the fact discovery period would end in "less than twenty days," and that they "should not be allowed to raise these serious allegations, idle away their time before the court, and then withdraw their claims with the intent of bringing them again some other time."

¶22 The court held a hearing on this matter in July 2021. At the conclusion of the hearing, the court stated,

> I would have found excusable delay on such a short time frame. I find that the [TKS parties] were involved with other stuff in the case even if they weren't doing that disclosure. Had they sought additional time from me, I would have granted it. I am loath to dismiss cases. I routinely grant more time . . . for the public policy reasons [the TKS parties' counsel] outlined about cases being resolved on the merits. So if Doug intends to re-pursue his claims, then I think that it is going to open up the necessity to hear a lot of the evidence that Troy alleges in his claims.

On September 14, 2021, the court issued a written "Order Granting Petitioners' Motion to Dismiss and Denying Respondent's Motion to Dismiss," in which it dismissed the TKS parties' tort claims without prejudice.

*Hearing and Decision on the Motion for Contempt Sanctions*

¶23 The following week, the court held a hearing on the contempt matter, with the judge who had not conducted the original stalking injunction proceedings presiding. The court informed the parties that "any of the facts that gave rise to" the Stalking Injunction were "beyond the scope" of the contempt

proceeding. Thus, the court limited the witnesses to giving "testimony in regards to the allegations in the contempt proceeding." The TKS parties contended that "the question of . . . whether [Troy] suffered emotional distress [from the alleged violations of the Stalking Injunction] is context specific" and that evidence of events that occurred before the contempt action was necessary to establish "what a reasonable person in Troy's shoes looks like." The court indicated that it would "take judicial notice of the fact that there were prior proceedings" and "of the order that was issued by [the previous judge] and the findings that [the previous judge] made in relation to" the initial proceedings. The TKS parties noted their concern that "there was testimony underlying those orders" and "some of the facts that . . . came out [were not] necessarily memorialized in [the Stalking Injunction] itself, or in [the prior] ruling." Doug also stated his contrary concern that Troy not be allowed to testify about matters the previous judge "found irrelevant or unpersuasive for purposes of [the Stalking Injunction]." The court then reiterated its view that "the scope of [the contempt] proceeding" was the "limited allegations of the order [to show cause]."

¶24 During the hearing, Doug did not dispute that he authored the Facebook post and related comments that the TKS parties contended violated the Stalking Injunction, nor did he dispute their contents. Also during the hearing, the court received evidence of an email Doug sent to Prior Customer in March 2021 asking Prior Customer to tell him the last date he did any business with TKS. Prior Customer responded by saying he was not a current TKS customer but that he had purchased some products from TKS a few months earlier. Prior Customer also testified that when he had initiated contact with Doug in the past, Doug had said, "[I]f you're a TKS customer, I can't talk to you . . . ."

¶25 The court issued an order on the contempt motion on October 13, 2021. Therein the court first explained that it was applying the standard for criminal contempt:

> Because Doug Wilson has substantially complied
> with the [Stalking Injunction], were the court to
> sanction Doug Wilson, the [principal] reason would
> be to vindicate the court's authority, rather than to
> compel future compliance. Because the court's
> primary purpose would be punitive in nature, the
> criminal standard of proof beyond a reason[able]
> doubt applies to the proceeding.

¶26 The court then addressed Doug's Facebook post and comments by turning to the language of the Stalking Injunction's Personal Conduct Order and noting that it "contain[ed] a citation" to Utah Code section 76-5-106.5 "for the legal definition of stalking" and that "the statute contains a provision precluding an enjoined party from communicating 'about' the protected party." But the court also noted that the Stalking Injunction did "not contain that language, and no evidence exist[ed] in the record that Doug Wilson ever consulted the statute." The court then determined that "because no evidence exist[ed] [that] Doug knew speaking indirectly about Troy would violate the order, a reasonable doubt exist[ed] as to whether Doug intended the message to violate[] the order." The court highlighted that "[n]either Troy Wilson nor any other protected party were friends on the Facebook platform with Doug Wilson at the time of his . . . posting, and Doug deleted the post and his account shortly thereafter." "Moreover," the court continued, "the post does not reference Troy Wilson by name, such that acquaintances unfamiliar with the details of the lawsuit would not associate Troy with the content of the post." And the court observed that "[i]n the subsequent comments to the original post, Doug Wilson asserted that his reference to 'my family member' who bore 'false witness against me' related to [Sister]" and Sister was not "among the protected parties" of the Stalking Injunction. The court concluded that "because Troy was not a Facebook friend of Doug and because the message [did] not reference Troy by name, a reasonable doubt exist[ed] as to whether Doug

intended the message to reach Troy and cause Troy emotional distress."

¶27 The court also considered "the circumstances surrounding the case at bar," which involved "great turmoil in the extended Wilson family" as "Doug and Troy are the youngest of 11 siblings, and the controversy was causing division and divided loyalties in the family." Given this, the court concluded that "a reasonable doubt exist[ed] as to whether the [Facebook] post was designed to harass or annoy Troy, rather than Doug's stated intention of determining who in the family supported him." Also of note, the court found "that all of the witnesses from [the] Wilson family possess[ed] such significant biases that the court [could not] credit any of their testimony beyond a reasonable doubt."

¶28 The court further determined that "a reasonable doubt exist[ed] as to whether a reasonable person in Troy Wilson's position, rather than any inordinately sensitive person, would suffer emotional distress because of that singular Facebook post, even if the post would cause some lesser degree of annoyance." On this front, the court stated that "[t]he only persons who commented on Doug's Facebook post were immediate Wilson family members, and the only persons who spoke to Troy about the post were family members and a small number of employees and old family friends." The court indicated that the evidence suggested that "all of the family members and acquaintances who viewed or learned about the post [held] Troy in high esteem and the post did not influence their perception of him."

¶29 As to Doug's communication with Prior Customer, the court stated that "the content" of Doug's messages to Prior Customer raised "a reasonable doubt as to whether Doug intentionally violated the order by sending those messages or whether he merely attempted to comply with the order, by obtaining written confirmation that [Prior Customer] was not a current customer, after [Prior Customer] initiated contact with Doug."

¶30    Ultimately, as to both the Facebook post and Doug's communication with Prior Customer, the court ruled that the TKS parties "failed to meet the heavy burden of establishing the alleged violations beyond a reasonable doubt" and thus denied the motion to find Doug in contempt.

### The Appeals

¶31    In November 2021, the TKS parties appealed the district court's decision declining to hold Doug in contempt. Later that same month, Doug appealed the Stalking Injunction and the district court's decision to dismiss the TKS parties' other claims without prejudice.

## ISSUES AND STANDARDS OF REVIEW

### Doug's Appeal

¶32    As an initial matter, the TKS parties assert that this court lacks jurisdiction over Doug's appeal. "Whether this court has jurisdiction over [an] appeal is a question of law that we review for correctness." *Ashton v. Learnframe, Inc.*, 2008 UT App 172, ¶ 7, 185 P.3d 1135, *cert. denied*, 199 P.3d 970 (Utah 2008).

¶33    Besides jurisdiction, Doug's appeal raises three issues. First, Doug asserts that the district court erred by employing a legally incorrect interpretation and application of the stalking statute when it ruled that Doug's actions "aimed at [TKS]" could form the basis of the Stalking Injunction in favor of Troy. "The proper interpretation and application of a statute is a question of law which we review for correctness . . . ." *Baird v. Baird*, 2014 UT 08, ¶ 16, 322 P.3d 728 (cleaned up); *see also Ragsdale v. Fishler*, 2021 UT 29, ¶¶ 15, 20, 491 P.3d 835 (reviewing "for correctness" the district court's determination of whether particular actions by the respondent legally qualified as a course of conduct "directed at" the petitioner (cleaned up)).

¶34    Second, Doug challenges the district court's finding that he knew or should have known that his actions constituting a "course of conduct" under the stalking statute would cause a reasonable person in Troy's position to experience emotional distress. "On review of both criminal and civil proceedings, we accept the trial court's findings of fact unless they are clearly erroneous." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988) (cleaned up), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991); *see also Baird*, 2014 UT 08, ¶ 16 ("When reviewing factual determinations, [appellate] court[s] will only rule as a matter of law if the evidence is so clear and persuasive that all reasonable minds would find one way." (cleaned up)).

¶35    Finally, Doug argues that the district court erred by dismissing the TKS parties' tort claims *without prejudice*. "A trial court has discretion to determine whether to grant a motion for voluntary dismissal," and it is "entitle[d] . . . to grant or dismiss the motion upon such terms and conditions as the court deems proper." *H&H Network Services, Inc. v. Unicity Int'l, Inc.*, 2014 UT App 73, ¶ 4, 323 P.3d 1025 (cleaned up). Accordingly, "we review a trial court's decision" as to granting a voluntary dismissal with or without prejudice "for an abuse of discretion." *Id.* (cleaned up).

*The TKS Parties' Appeal*

¶36    In their appeal, the TKS parties assert that the district court erred when it applied "the criminal standard" for contempt. They further contest the court's determination not to hold Doug in contempt. When, as here, the alleged "contempt is not committed in the immediate view and presence of the court or judge, we review a district court's findings of fact for clear error and apply a correction of error standard to our review of the district court's legal determinations." *Valerios Corp. v. Macias*, 2015 UT App 4, ¶ 10, 342 P.3d 1127 (cleaned up). Once a court finds the existence of facts necessary to support a contempt sanction, "the decision to hold a party in contempt of court rests within the sound discretion

of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *Anderson v. Thompson*, 2008 UT App 3, ¶ 11, 176 P.3d 464 (cleaned up). "That discretion includes not just the power to decide whether a party should be held in contempt, but the power to determine whether the purpose of a particular contempt order is civil or criminal." *Dickman Family Props., Inc. v. White*, 2013 UT App 116, ¶ 3, 302 P.3d 833 (cleaned up), *cert. denied*, 312 P.3d 619 (Utah 2013).

¶37 The TKS parties also challenge the district court's decision to exclude from the contempt proceedings evidence of the full circumstances surrounding the incidents that gave rise to the Stalking Injunction. We review the district court's "determinations regarding the admissibility of evidence under an abuse of discretion standard." *Anderson*, 2008 UT App 3, ¶ 25.

## ANALYSIS

### I. Doug's Appeal

¶38 We first address Doug's appeal. Doug challenges the district court's decision to issue the Stalking Injunction in the first instance. He also challenges the district court's decision to dismiss the TKS parties' tort claims without prejudice. For their part, the TKS parties contend that "this court lacks jurisdiction to consider [Doug's] appeal because it was not made timely." We begin by addressing the threshold issue of jurisdiction. We then address, in turn, Doug's challenges to the district court's orders.

### A. Whether This Court Has Jurisdiction

¶39 The TKS parties contend that Doug did not file a timely notice of appeal and, therefore, that this court lacks jurisdiction over his appeal. According to the TKS parties, the court's order dismissing the TKS parties' claims without prejudice on

September 14, 2021, was a final judgment that triggered the thirty-day deadline for Doug to file a notice of appeal. Thus, the TKS parties assert, "Doug's appeal of the principal action was due October 14, 2021—more than a month before Doug filed a notice of appeal." We hold that the September 14 order was not a final judgment and, therefore, that it did not trigger the thirty-day deadline for Doug to file a notice of appeal. Instead, the thirty-day deadline for Doug to file a notice of appeal was triggered 150 days after the court entered the September 14 order.[5]

---

5. We are not unaware of rule 4(d) of the Utah Rules of Appellate Procedure, which states that "[i]f a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days after the date on which the first notice of appeal was filed." If rule 4(d) applied here, Doug would have had fourteen days from the date the TKS parties filed their notice of appeal to file his notice of appeal, and Doug in fact did file his notice of appeal within fourteen days of when the TKS parties filed theirs. But rule 4(d) does not apply here. This matter involves both the TKS parties' original lawsuit and a subsequent criminal contempt proceeding, *see infra* ¶¶ 69–73 (concluding that the district court did not abuse its discretion in classifying the contempt proceeding as criminal), and a criminal contempt proceeding is an action "separate and apart from the [principal] action," *Robinson v. City Court*, 185 P.2d 256, 258 (Utah 1947). Because the original lawsuit and the contempt proceeding are separate actions, the appeal deadlines for those separate actions operate independently. *See Burgers v. Maiben*, 652 P.2d 1320, 1322 (Utah 1982) (per curiam) (holding that a notice of appeal that was untimely to perfect an appeal from the original action was timely and conferred appellate jurisdiction to review a related criminal contempt proceeding). Thus, notwithstanding that they have been designated cross-appeals for ease of reference and share a common appellate case number, the two appeals in this matter are

(continued…)

¶40   Rule 4 of the Utah Rules of Appellate Procedure provides that, with a few exceptions not applicable here, "in a case in which an appeal is permitted as a matter of right from the trial court to the appellate court, the notice of appeal . . . must be filed with the clerk of the trial court within 30 days after the date of entry of the judgment or order appealed from." Utah R. App. P. 4(a). Rule 58A of the Utah Rules of Civil Procedure requires that, again with some exceptions that are not applicable here, "[e]very judgment and amended judgment must be set out in a separate document ordinarily titled 'Judgment'—or, as appropriate, 'Decree.'" Utah R. Civ. P. 58A(a)—(b). Rule 58A also provides that when "a separate document is required, a judgment is complete and is entered at the earlier of" (A) when "the judgment is set out in a separate document signed by the judge and recorded in the docket" or (B) when "150 days have run from the clerk recording the decision, however designated, that provides the basis for the entry of judgment." *Id.* R. 58A(e)(2).

¶41   In *Griffin v. Snow Christensen & Martineau*, 2020 UT 33, 467 P.3d 833, our supreme court analyzed an "Order of Dismissal with Prejudice" entered by the trial court in that case to determine whether it met the requirements of rule 58A(a) and was thus a "judgment" under that rule. *Id.* ¶¶ 23–28. The order had been prepared in response to a directive from the trial court to the defendant's counsel to "draft[] a proposed order confirming the court's oral ruling" on the defendant's motion to dismiss. *Id.* ¶ 23. The supreme court held that the order did not qualify as a "judgment" under rule 58A(a). *Id.* ¶ 28.

¶42   The supreme court first explained that "the goal of Utah rule 58A(a) is to impose a clear line of demarcation between a judgment and an opinion or memorandum" and that "to distinguish a judgment from an order or ruling, it should be

_____

separate, and the deadline for Doug to perfect his appeal from the TKS parties' original lawsuit was thirty days after entry of the final judgment in that lawsuit, *see* Utah R. App. P. 4(a).

identified accordingly." *Id.* ¶ 22 (cleaned up). The court then observed that the order at issue "was not titled 'Judgment,' but was instead named 'Order of Dismissal with Prejudice'" and that this was "not a mere technical deviation" from the rule. *Id.* ¶ 23. Rather, the title "accurately described" the document's purpose, which was to confirm the trial court's oral ruling, not to be "a separate judgment documenting the resolution of all claims in the district court." *Id.*

¶43    The supreme court next emphasized the rule's requirement that a "judgment be set out in a 'separate document.'" *Id.* ¶ 24 (cleaned up). It noted that "separate means individual; distinct; particular; disconnected" and declared that "a separate judgment, by definition, must be self-contained and independent from any other document in the case, including the decision that gave rise to it." *Id.* (cleaned up). Even if a particular decision "disposes of all claims in the action" and the trial court "directs a party to prepare an order confirming [that] decision," the court explained, "a separate judgment is required" in order to comply with rule 58A(a). *Id.* ¶ 26 (cleaned up). Although the order at issue in *Griffin* was "separate from the [trial] court's oral ruling and accompanying minute entry, that [was] beside the point." *Id.* To be a "judgment," it needed to be wholly separate from the decision giving rise to the judgment. *See id.*

¶44    Finally, and "[m]ost importantly," the *Griffin* court observed that the order in that case "serve[d] a different function than a 58A(a) judgment." *Id.* ¶ 27. The purpose of "a separate 58A(a) judgment" is not to "operate at the decision level" but, rather, to "operate[] at the case level to signal that all claims involving all parties have been resolved." *Id.* The fact that the order at issue in *Griffin* "contain[ed] procedural history, legal reasoning, and factual content" indicated that it operated at the decision level, not the case level. *Id.* ¶ 28.

¶45    In sum, because the document in *Griffin* was not "clearly identified as a judgment," was not "separate from the court's

decision on the relevant motion," and was not "limited to only that information relevant to a judgment," it was "not a separate 58A(a) judgment." *Id.*

¶46 The reasoning of *Griffin* applies here, compelling the conclusion that the September 14 order is not a separate rule 58A(a) judgment either. Like the order in *Griffin*, the September 14 order is not titled "Judgment" but, instead, is titled "Order Granting Petitioners' Motion to Dismiss and Denying Respondent's Motion to Dismiss." Also like the order in *Griffin*, the September 14 order does not amount to a self-contained judgment that is independent from the decision that gave rise to it. Finally, the September 14 order operates primarily at the decision level, not at the case level. It states, in full:

> This case came on for hearing on July 13, 2021[,] on: (1) the Motion to Dismiss filed by [the TKS parties], which sought voluntary dismissal of Causes of Action 1–7 contained in the Verified Complaint & Petition for Civil Stalking Injunction ("the Complaint"), without prejudice; and (2) [Doug's] Motion to Dismiss, which sought dismissal of the same claims with prejudice. . . . The [c]ourt, having considered the motions and corresponding memoranda, and the oral argument of counsel, for the reasons stated on the record, HEREBY ORDERS THAT:
>
> > 1. [The TKS parties'] Motion to Dismiss is GRANTED;
> >
> > 2. [Doug's] Motion to Dismiss is DENIED;
> >
> > 3. Claims 1–7 in the Complaint are dismissed without prejudice; [and]

4. With Claim 8 having resulted in the issuance of a civil stalking injunction, and [Doug] having previously dismissed his counterclaim, all claims in this case have now been resolved.

While the order does not wax long on "procedural history, legal reasoning, and factual content," *id.*, it does address the procedural posture of the motions, recount details of the hearing, and incorporate the reasoning the court stated at the hearing—all decision-level information. Admittedly, the last sentence of the order says that "all claims in this case have now been resolved," which is a case-level statement. But because the order predominantly operates at the decision level, it does not qualify as a judgment under rule 58A(a). *Cf. In re Cendant Corp.*, 454 F.3d 235, 241 (3d Cir. 2006) (explaining that to qualify as a judgment under federal rule 58(a), an order "must omit (or at least substantially omit) the [d]istrict [c]ourt's reasons for disposing of the parties' claims").[6]

¶47     The TKS parties ask us to conclude that the September 14 order qualifies as a judgment because "the parties exchanged emails about and edited the document to clarify that the case was over with nothing left to be litigated." After the TKS parties' counsel emailed the proposed order to Doug's counsel for approval, Doug's counsel responded with an email saying, "What is your position as to [cause of action] #8 (injunction)[?] We probably need to make it clear as to whether the case is over or not through this. It seems that this ends the case, but I am not sure if you are of the same opinion." Counsel for the TKS parties wrote back, "We are of that opinion. Each of the claims in the Verified

---

6. Our supreme court has said that *In re Cendant Corp.*, 454 F.3d 235 (3d Cir. 2006), "provides a helpful description of what a proper separate judgment should look like." *Griffin v. Snow Christensen & Martineau*, 2020 UT 33, ¶ 21, 467 P.3d 833.

Complaint has been resolved, and with this dismissal and Doug's earlier dismissal of his counterclaim, there is nothing left to be litigated in this case. For clarity, I've added a sentence in the attached." From this exchange, it does appear that the parties intended for the September 14 order to serve as a judgment under rule 58A(a). But because this court's jurisdiction is tied to a timing determination that depends on when a final judgment is entered, the question of whether a document complies with rule 58A(a) cannot turn on the parties' subjective intent. *Cf. Duke Cap. LLC v. Proctor*, 2023 UT App 59, ¶ 25, 531 P.3d 745 (recognizing that "parties cannot create, by contract, jurisdiction that would not otherwise exist" (cleaned up)). Instead, rule 58A(a) compliance is determined by whether the document at issue objectively satisfies the requirements of the rule.

¶48 The September 14 order objectively does not satisfy the requirements of rule 58A(a), and it therefore did not trigger a thirty-day deadline to appeal. Instead, that deadline was triggered 150 days after the clerk recorded the September 14 order. *See* Utah R. Civ. P. 58A(e)(2)(B). Thus, Doug's appeal, which was filed before those 150 days had run, was timely. *See* Utah R. App. P. 4(c) ("A notice of appeal filed after the announcement of a decision, judgment, or order but before entry of the judgment or order will be treated as filed after such entry and on the day thereof."). We therefore have jurisdiction to consider it.

B. Whether the Stalking Injunction Was Proper

¶49 Having determined that we have jurisdiction to consider Doug's appeal, we now address his first contention, which is that the district court should not have granted the Stalking Injunction in the first instance. "Under Utah's civil stalking [injunction] statute, a person who believes that he or she is the victim of stalking may obtain an injunction against an alleged stalker" by "prov[ing] by a preponderance of the evidence that an offense of stalking has occurred." *Ragsdale v. Fishler*, 2021 UT 29, ¶ 25, 491

P.3d 835 (cleaned up); *see also* Utah Code § 78B-7-701. At the time of Doug's alleged stalking, to prove that an offense of stalking had occurred, a person was required to show that (1) the alleged stalker "intentionally or knowingly engage[d] in a course of conduct directed at [the] person" and (2) the alleged stalker knew or should have known "that the course of conduct would cause a reasonable person to fear for the person's own safety or suffer other emotional distress." *Ragsdale*, 2021 UT 29, ¶ 25 (cleaned up); *see also* Utah Code § 76-5-106.5(2) (2020). Doug asserts that (1) the district court committed legal error when it ruled that Doug had engaged in a course of conduct and (2) even if Doug had engaged in a course of conduct, the evidence does not support a finding that Doug knew or should have known that the course of conduct would cause a reasonable person to suffer emotional distress. We disagree with each of Doug's assertions.

### 1. Course of Conduct

¶50　Doug asserts that the court committed legal error when it ruled that he had engaged in a course of conduct. The stalking statute's definition of a "[c]ourse of conduct" is broad. *See* Utah Code § 76-5-106.5(1)(a)(i). It defines a course of conduct as "two or more acts directed at or toward a specific individual," *id.*, and it says that those acts may include "acts in which the actor . . . communicates to or about an individual, or interferes with an individual's property . . . directly, indirectly, or through any third party," *id.* § 76-5-106.5(1)(a)(i)(A). It also says that the acts may include instances when the actor "appears at the individual's workplace or contacts the individual's . . . coworker"; "enters property owned, leased, or occupied by an individual"; or "sends material . . . for the purpose of . . . disseminating information about . . . the individual to a . . . coworker, friend, or associate of the individual." *Id.* § 76-5-106.5(1)(a)(i)(B)(II)–(IV). Any of the foregoing types of conduct qualifies to be part of a course of conduct even if the actor "uses a computer, the Internet, text messaging, or any other electronic means to commit [the] act." *Id.* § 76-5-106.5(1)(a)(i)(B)(VI).

¶51 In this case, Doug agrees that the district court identified three instances of stalking behavior that the court said amounted to a course of conduct. First, the court identified the conversations during which Doug essentially told Sister, "I will ruin Troy. I will contact customers. I will bring the company down. . . . [T]hey will lose the business. They'll lose everything." Second, the court identified the text message Doug sent to Vendor asking what he had been talking about with a TKS employee, even though Doug had not been visibly present during the conversation and the participants would not, therefore, have had reason to know that Doug was aware the conversation had occurred. Third, the court identified a conversation between Doug and Vendor wherein Doug "suggested that he was going to go to . . . [a] customer [of TKS] and tell them how their . . . product [was] being handled."

¶52 After identifying these instances of stalking behavior, the district court said, "[I'm] satisfied to a preponderance that there is a course of action, that it was directed in such a way that although it was aimed at the company, [it] was aimed at the company in a particularly harmful way and that it satisfies the requirements of the stalking [statute]." Based on this statement, Doug contends that the court's finding of a course of conduct was "mistaken as a matter of law" because "[n]owhere in the stalking statute does it suggest that a harm can be directed at a company" and qualify as part of a course of conduct but, rather, "harms to companies, as opposed to specific individuals, are simply not contemplated by the statute." Restated, we understand Doug's argument to be that conduct that the court acknowledges was "aimed at [TKS]" cannot at the same time legally qualify as conduct "directed at" Troy for purposes of finding a course of conduct under the stalking statute.[7]

---

7. We understand this to be Doug's argument because the Stalking Injunction was entered in favor of Troy and not in favor of TKS. Because the Stalking Injunction was not entered in favor of TKS,

(continued…)

¶53 Our supreme court considered a related question in *Ragsdale v. Fishler*, 2021 UT 29, 491 P.3d 835. There, the director of "an inpatient treatment facility for young women recovering from severe depression and anxiety" sought a civil stalking injunction protecting her from a neighbor living on the same street as the facility. *Id.* ¶¶ 1, 6–7. The neighbor "feared [the facility] would increase noise and traffic in the neighborhood," and he "began protesting the facility directly" by placing "signs in his yard" that disparaged the facility. *Id.* ¶¶ 6–7. "He also began flipping off and swearing at employees, clients, and anyone else involved with [the facility]." *Id.* ¶ 7. Eventually, after the neighbor routinely flipped off the director and began "coming out of his garage to say things" to her directly, the director sought a stalking injunction against the neighbor. *Id.* ¶¶ 7–9. The district court issued an ex parte temporary injunction, but following an evidentiary hearing, it declined to issue a permanent stalking injunction, reasoning that the neighbor had "not direct[ed] his conduct at [the director] but toward [the facility] as a business." *Id.* ¶¶ 9, 12.

¶54 On appeal, the supreme court ruled that the district court had "erred in concluding that because [the neighbor] claimed to subjectively target only [the facility], he did not direct his conduct at [the director]." *Id.* ¶ 24. The supreme court observed that "nothing in the statute defines the term 'directed at'" or "expressly indicate[s] that [a stalking] petitioner must be the

---

this case cannot implicate or resolve the issue of whether a stalking injunction may be issued in favor of a company. With our supreme court, "we note that at least one court has found its state's civil stalking statute to 'protect[] institutions as well as people.'" *Ragsdale v. Fishler*, 2021 UT 29, ¶ 39 n.29, 491 P.3d 835 (quoting *Board of Regents-UW System v. Decker*, 2014 WI 68, ¶ 26, 850 N.W.2d 112 (alteration in original)). But again, this case does not raise that issue, and we, like the supreme court before us, do not address it. *See id.*

'ultimate target' of a respondent's course of conduct." *Id.* ¶ 31. Instead, the court explained, "regardless of whether a petitioner is a respondent's ultimate target, the fact that the respondent engaged in any act proscribed by the statute two or more times makes his or her conduct 'directed at' the petitioner." *Id.* ¶ 32. Thus, the *Ragsdale* court concluded, "the person toward whom a respondent's behavior is 'directed at' . . . is determined by an objective assessment of whether the respondent engaged in conduct prohibited by the stalking statute." *Id.* ¶ 37. "And this is true even where a respondent directs his or her conduct at a petitioner indirectly or through a third party." *Id.* (cleaned up). Accordingly, "[t]he fact that [the facility] was allegedly [the neighbor's] ultimate target [did] not shield him" from a finding that his actions constituted a course of conduct toward the director. *Id.* ¶¶ 39, 42. "It simply mean[t] [that the facility] could potentially obtain an injunction against [the neighbor] as well." *Id.* ¶ 39; *see also supra* note 7. Based on this holding, the supreme court remanded the *Ragsdale* case to the district court for a course-of-conduct determination under a proper understanding of the statute. 2021 UT 29, ¶ 43.

¶55 Another case merits mention in this context as well. In *Carson v. Barnes*, 2016 UT App 214, 385 P.3d 744, a petitioner sought a stalking injunction based on an alleged course of conduct that included an incident where the respondent had taken "a handgun from his vehicle and confronted" two business associates of the petitioner when the petitioner was not present. *Id.* ¶¶ 3, 9, 16. The respondent contended that reliance on this incident was "problematic because [the petitioner] was not present, and therefore [the respondent's] actions on that day were not 'directed at' [the petitioner] as the statute requires." *Id.* ¶ 16. We disagreed and held that "the statute does not require the victim to be physically present for an act to be considered in the course of conduct" because "the plain language of the statute . . . includes situations in which the actor comes to the person's workplace or contacts the person's . . . coworkers,

without requiring the presence of the victim." *Id.* ¶¶ 16–17 (cleaned up).

¶56 The *Ragsdale* and *Carson* holdings apply to this case. Specifically, under the *Ragsdale* holding, the district court's acknowledgment that Doug's conduct "was aimed at [TKS]" is not legally at odds with a determination that Doug had engaged in a course of action directed at Troy. That is because an objective assessment reveals that each of the three instances of stalking behavior the court identified qualify as conduct prohibited by the statute. Doug's conversations with Sister wherein he said, among other things, that he would ruin Troy amounted to acts in which Doug "communicate[d] . . . about [Troy] . . . directly, indirectly, or through any third party." Utah Code § 76-5-106.5(1)(a)(i)(A)(I). And Doug's text message to Vendor about a conversation Doug had not been visibly present for as well as Doug's conversation with Vendor wherein he suggested that he was going to tell a TKS customer how their product was being handled each amounted to Doug "contact[ing] [Troy's] . . . coworker," *id.* § 76-5-106.5(1)(a)(i)(B)(II), and perhaps also to Doug "send[ing] material . . . to a . . . coworker" of Troy "for the purpose of . . . communicating with [Troy]," *id.* § 76-5-106.5(1)(a)(i)(B)(IV). Additionally, under the *Carson* holding, none of these actions by Doug are disqualified from contributing to a course of conduct directed at Troy by virtue of the fact that Troy was not present for or the direct recipient of the conduct. Because an objective assessment reveals that each of the three instances of stalking behavior the court identified qualify as conduct prohibited by the stalking statute as against Troy, the court committed no legal error by ruling that these three instances constituted a course of conduct directed at Troy, even if the same instances might also have been aimed at TKS.

2. Emotional Distress

¶57 Doug also asserts that, even if he engaged in a course of conduct directed at Troy, the evidence does not support the

district court's implicit finding that Doug knew or should have known that the course of conduct would cause a reasonable person to suffer emotional distress.[8] At the time of Doug's alleged conduct, a determination that stalking had occurred required a finding that the actor "[knew] or should [have known] that the course of conduct would cause a reasonable person . . . to fear for the person's own safety or the safety of a third person" or "to suffer other emotional distress." Utah Code § 76-5-106.5(2) (2020).[9] The statute defines "[e]motional distress" to mean "significant mental or psychological suffering." *Id.* § 76-5-106.5(1)(a)(ii)(A) (2024). And it defines "[r]easonable person" to mean "a reasonable person in the victim's circumstances." *Id.* § 76-5-106.5(1)(a)(v). "By including 'in the victim's circumstances' as part of the reasonable person definition, the statute provides for an individualized objective standard, meaning that a court

---

8. We see in the record no explicit finding that Doug knew or should have known that his course of conduct would cause a reasonable person to suffer emotional distress. Generally, however, "unstated findings can be implied if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *Uhrhahn Constr. & Design, Inc. v. Hopkins*, 2008 UT App 41, ¶ 23, 179 P.3d 808 (cleaned up). And here, the necessary finding regarding emotional distress is implicit in the court's statement that "although [the course of conduct] was aimed at the company, [it] was aimed at the company in a particularly harmful way and . . . satisfies the requirements of the stalking [statute]." At a minimum, Doug makes no argument to the contrary.

9. In contrast, the current version of the code requires a finding that the actor "[knew] or [*was*] *reckless as to whether* the course of conduct would cause a reasonable person . . . to fear for the individual's own safety or the safety of a third individual" or "to suffer other emotional distress." Utah Code § 76-5-106.5(2)(a) (emphasis added).

must consider the entire context surrounding the defendant's conduct." *Richins v. Weldon*, 2023 UT App 147, ¶ 67, 541 P.3d 274 (cleaned up). "Courts applying this individualized objective standard have considered such factors as the victim's background, the victim's knowledge of and relationship with the defendant, any history of abuse between the parties, the location of the alleged stalking, and the cumulative effect of the defendant's repetitive conduct." *Id.* (cleaned up). "Another consideration could be whether the behavior might cause damage to one's reputation, relationships, or livelihood." *Id.* (cleaned up).

¶58    With regard to the consideration of whether a course of conduct might cause damage to one's reputation, relationship, or livelihood, the stalking case of *Richins v. Weldon*, 2023 UT App 147, 541 P.3d 274, is instructive. There, this court emphasized that the respondent "was saying very negative things" about the petitioner, a vice president of a company, to the petitioner's "fellow employees and boss, including telling [the boss] that he should fire" the petitioner. *Id.* ¶¶ 2, 69. Because the respondent's "behavior could have damaged [the petitioner's] work relationships and reputation as well as his livelihood," we determined that "ample evidence existed for the district court to conclude that a reasonable person in [the petitioner's] circumstances would feel emotional distress." *Id.* ¶ 69.

¶59    Here, Doug was a former production manager of TKS who was familiar with TKS's operations and employees. After leaving TKS, he was employed by Landlord and continued to work in the same building that housed TKS. Thus, Doug was well positioned to harm Troy by harming TKS. And that's exactly what he told Sister he intended to do. Doug asserts that "[e]xpressing an intent to sue is not emotionally distressing" and that "[w]anting to 'ruin' someone is more so an expression of frustration or anger rather than a phrase intended to cause significant stress or suffering." We agree that a threat of civil litigation by itself would not satisfy the emotional distress component of stalking. But Doug did not simply threaten to file a lawsuit, and we do not agree that, under

the circumstances, the court was required to interpret Doug's express desire to "ruin" Troy and cause both TKS and Troy to "lose everything" to be a mere expression of frustration. Actions undermining TKS could certainly undermine Troy's livelihood where Troy held a 50% interest in TKS. And if TKS employees felt targeted by Doug in his effort to get at Troy, that could certainly interfere with Troy's work relationships. Indeed, the district court specifically found that the sum of Doug's communications to Sister "evince[d] an intent to . . . cause emotional distress to a specific person," namely Troy; that the text from Doug to Vendor "create[d] the impression" that Doug was "all-knowing" and "create[d] a sense of unease and discomfort" that could "upset the workings of a company and . . . create a cloud of suspicion and distrust for the company"; and that the conversation wherein Doug "suggested that he was going to go to . . . [a] customer and tell them how their . . . product [was] being handled" "undermine[d] the wellbeing of the company." All of these findings were reasonable under the circumstances, and they amply support the overarching finding that Doug knew or should have known that his course of conduct would cause emotional distress to a reasonable person in Troy's position.

¶60 Accordingly, Doug has failed to demonstrate that the district court erred in issuing the Stalking Injunction.[10]

C. Whether the TKS Parties' Tort Claims Were Properly Dismissed Without Prejudice

¶61 Apart from challenging the Stalking Injunction, Doug also argues that the district court abused its discretion when it dismissed the TKS parties' tort claims without prejudice, as

---

10. While we have concluded that the district court correctly interpreted the stalking statute and that its findings here are supported by the evidence, courts should remain cautious about allowing civil stalking injunctions to be used as tools in commercial litigation.

opposed to with prejudice. Rule 41 of the Utah Rules of Civil Procedure indicates that "[u]nless the order states otherwise, a [voluntary] dismissal [by court order] is without prejudice." Utah R. Civ. P. 41(a)(2). This provision confirms that the default for voluntary dismissals is dismissal without prejudice. The rule also directs a court to grant a motion for voluntary dismissal "only on terms the court considers proper." *Id.* In *Rohan v. Boseman*, 2002 UT App 109, 46 P.3d 753, *cert. denied*, 59 P.3d 603 (Utah 2002), we adopted the Tenth Circuit's analysis in *Ohlander v. Larson*, 114 F.3d 1531, 1537 (10th Cir. 1997), which includes a list of "relevant factors the trial court should consider" when determining "proper" terms of dismissal under rule 41(a)(2). *Rohan*, 2002 UT App 109, ¶¶ 20–22 (cleaned up). The *Ohlander* factors include "the opposing party's effort and expense in preparing for trial; excessive delay and lack of diligence on the part of the movant; insufficient explanation of the need for a dismissal; and the present stage of the litigation." *Id.* ¶ 21 (cleaned up). These factors have since been employed in analyzing a district court's decision to grant or deny a motion for voluntary dismissal, *see, e.g.*, *Keystone Ins. Agency v. Inside Ins.*, 2019 UT 20, ¶¶ 25–26, 445 P.3d 434, and in analyzing a district court's decision to grant a motion for voluntary dismissal with or without prejudice, *see H&H Network Services, Inc. v. Unicity Int'l, Inc.*, 2014 UT App 73, ¶ 5, 323 P.3d 1025. These factors "are by no means exclusive[,] and any other relevant factors should also be considered." *Id.* (cleaned up).

¶62 Doug frames his argument in terms of the factors set forth in *Westinghouse Electric Supply Co. v. Paul W. Larsen Contractor, Inc.*, 544 P.2d 876 (Utah 1975), which are used when determining whether a dismissal with prejudice for failure to prosecute should be granted: "the length of time since the suit was filed," "the conduct of both parties," "the opportunity [the parties have] had to move the case forward and what they have done about it," "what difficulty or prejudice may have been caused to the other side," and "whether injustice may result from the dismissal." *Id.*

at 879. These factors are similar to the *Ohlander* factors, and we agree that some of them are also relevant here.

¶63    Under the *Ohlander* and *Westinghouse* factors that we deem to be relevant here, we conclude that the district court did not abuse its discretion in dismissing the TKS parties' tort claims without prejudice. First, as to whether injustice resulted from a dismissal without prejudice, we note that Doug's claims—which he raised as counterclaims to the TKS parties' complaint—were also voluntarily dismissed without prejudice, leaving Doug able to bring his claims again in the future if he so desires. On this score, the court's dismissal of the TKS parties' claims without prejudice preserved parity between the parties regarding possible future litigation, an outcome that appears just on its face. *Cf. Clear Creek Dev., LLC v. Peterson Pipeline Ass'n*, 2024 UT App 22, ¶ 24, 545 P.3d 306 (stating, in the context of determining when a counterclaim is compulsory under rule 13(a) of the Utah Rules of Civil Procedure, that an outcome "allowing *both* parties the option to bring their claims anew in a subsequent action . . . is certainly the more just outcome").

¶64    Doug argues that the district court abused its discretion by dismissing the TKS parties' claims without (as opposed to with) prejudice because "[t]he case had been on the court's docket for almost eight months," "fact discovery was set to end [in] less than three weeks," and "the TKS parties had done nothing to litigate any of their [tort] claims." These facts implicate the *Ohlander* factor regarding excessive delay and lack of diligence on the part of the movant. But we believe that these factors ultimately weigh neutrally or in the TKS parties' favor here. During the eight months that their tort claims were pending, the TKS parties did not exhibit a lack of diligence generally; they were actively litigating their request for a stalking injunction as well as their motion for contempt sanctions. Additionally, we credit the district court's indication that, in its view, the eight-month delay in discovery was a relatively "short time frame" under the circumstances and that an allowance of "additional time" for

discovery would have been merited if the TKS parties had sought it.

¶65   As to the factor regarding the opposing party's expense in preparing for trial, we do not have reason to doubt Doug's claim that his litigation expenses "amounted to over a third of his yearly salary." Yet those expenses were nevertheless limited by the TKS parties' decision not to initiate depositions and other costly discovery related to their tort claims while they litigated the Stalking Injunction. Thus, we believe that this factor weighs out neutrally when it comes to evaluating the propriety of dismissing the TKS parties' claims without prejudice.

¶66   Finally, Doug argues that dismissal with prejudice was required because the TKS parties' "unsubstantiated claims have cost [him] his personal relationships and led him to try and commit suicide." While we are not unsympathetic to the emotional and relationship costs that are often incurred through litigation, Doug provides no support for the proposition that this type of prejudice is properly within the scope of our inquiry. Without such authority, we are unconvinced that emotional and relationship costs constitute the type of "legal prejudice" that the *Ohlander* factors are designed to prevent. *See* 114 F.3d at 1537 (explaining that "[t]he parameters of what constitutes 'legal prejudice' are not entirely clear" but providing factors to guide this inquiry, which speak in terms of "effort," "delay," "expense," and "diligence"). Indeed, although to this point the TKS parties' tort claims have not been substantiated, there has been no contention that they are frivolous, and our system does not condition the ability to maintain potentially meritorious litigation on a showing that the process will not cause stress to the opposing party.

¶67   In sum, in light of the factors that are relevant here, we determine that the district court did not abuse its discretion by dismissing the TKS parties' tort claims without prejudice.

II. The TKS Parties' Appeal

¶68 We now turn to the TKS parties' appeal. The TKS parties first challenge the district court's decision to treat their motion for contempt sanctions as a motion to hold Doug in *criminal* contempt rather than *civil* contempt. The TKS parties also challenge, for several reasons, the court's decision not to hold Doug in criminal contempt. We address the TKS parties' various arguments in turn.

A. Whether the District Court Applied the Correct Standard for Contempt

¶69 The TKS parties assert that the district court erred by "applying the criminal standard" for contempt. We disagree.

¶70 Whether a contemplated contempt order is civil or criminal determines the standard of proof a court must apply to find that the elements of contempt have been met: for civil contempt, the standard is clear and convincing evidence; for criminal contempt, it is proof beyond a reasonable doubt. *Koehler v. Allen*, 2020 UT App 73, ¶ 14 & n.3, 466 P.3d 738. "The primary determinant of whether a particular contempt order is to be labeled civil or criminal is the trial court's purpose in entering the order." *Von Hake v. Thomas*, 759 P.2d 1162, 1168 (Utah 1988), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991). "A criminal contempt order is punitive in nature, whereas a civil contempt order has a remedial purpose." *Koehler*, 2020 UT App 73, ¶ 14 n.3. "A remedial purpose is indicated when the contemner is allowed to purge him- or herself of the contempt by complying with the court's orders." *Von Hake*, 759 P.2d at 1168. Accordingly, "a contempt order is criminal if the fine or sentence imposed is fixed and unconditional, but [it] is civil if the fine or imprisonment is conditional such that the contemner can obtain relief from the contempt order merely by doing some act as ordered by the court." *Id.* at 1168 n.5. For example, in the stalking injunction context, this court has found a contempt order civil when its sanctions included "a jail term of 10 days and a fine of

$300" because "these sanctions were stayed to allow [the contemner] an opportunity to purge his contempt . . . by having no further contact . . . with [the protected party] for a period of two years." *Koehler*, 2020 UT App 73, ¶ 14 n.3 (cleaned up).

¶71 The district court determined that the contemplated contempt order in this case was criminal, explaining:

> Because Doug Wilson has substantially complied with the [Stalking Injunction], were the court to sanction Doug Wilson, the [principal] reason would be to vindicate the court's authority, rather than to compel future compliance. Because the court's primary purpose would be punitive in nature, the criminal standard of proof beyond a reason[able] doubt applies to the proceeding.

This determination was not an abuse of discretion.

¶72 First, the TKS parties did not indicate in their motion for contempt that they were seeking a civil contempt adjudication. Their motion asked the court to "impose a fine and/or incarceration," without any mention of giving Doug an opportunity to purge his contempt. That the relief the TKS parties requested was not conditional suggests that the contempt they sought was not civil. *See id.* ("Because this order was conditional such that [the contemner] could obtain relief by staying away from [the protected party], the contempt order is not criminal but civil.").

¶73 Moreover, regardless of what the TKS parties requested, the court gave sound reasons for its application of the criminal standard. Its finding that Doug had "substantially complied" with the terms of the Stalking Injunction—a finding that the TKS parties do not challenge on appeal—supports the court's determination that the chief reason for it to hold Doug in contempt "would be to vindicate the court's authority, rather than

to compel future compliance." This finding supports the court's determination that a contempt sanction in this case would be "punitive in nature." The court employed the correct standard in approaching this issue, and it provided sound reasoning for its determination that the proceeding was criminal in nature. Thus, the court did not abuse its discretion related to this issue.

### B. Whether the District Court Erred in Not Holding Doug in Contempt

¶74 The TKS parties next challenge the district court's decision, even under the criminal standard, not to hold Doug in contempt. Relatedly, the TKS parties also assert that the court abused its discretion by excluding certain evidence during the contempt hearing. The TKS parties' motion for contempt sanctions was based on two sets of alleged violations of the Stalking Injunction: Doug's communications with Prior Customer and Doug's Facebook post and related comments. We first review the court's determination that Doug's communications with Prior Customer did not satisfy the elements of contempt. We then review the court's determination that Doug's Facebook post did not satisfy the elements of contempt. We address the evidentiary issue as part of our review of the court's determination that Doug's Facebook post did not satisfy the elements of contempt.

#### 1. Doug's Communications with Prior Customer

¶75 The TKS parties identified Doug's communications with Prior Customer as violative of the Stalking Injunction's No Contact Order. "As a general rule, in order to prove contempt for failure to comply with a court order it must be shown that the person cited for contempt knew what was required, had the ability to comply, and intentionally failed or refused to do so." *Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991). The district court found that the TKS parties failed to prove beyond a reasonable doubt that by communicating with

Prior Customer Doug intentionally failed to comply with the Stalking Injunction. The TKS parties challenge that finding. We determine that this finding is not clearly erroneous and, therefore, that Doug's communications with Prior Customer cannot be a basis for holding Doug in contempt.

¶76   The Stalking Injunction's No Contact Order stated that "Doug must not contact, phone, text, mail, email, or communicate . . . either directly or indirectly in any way with . . . [a]ny customer of TKS." While there was evidence that Doug spoke with and emailed Prior Customer, who had at some point been a customer of TKS, the district court was also presented with evidence that Prior Customer had been the one to initiate contact with Doug and that when he had initiated contact, Doug told him, "[I]f you're a TKS customer, I can't talk to you . . . ." The court also received evidence that Doug subsequently sent Prior Customer an email asking for the last date on which he had done business with TKS. Prior Customer responded by saying he was not a current TKS customer but that he had purchased some products from TKS a few months earlier. The court found that "the content" of Doug's communications with Prior Customer raised "a reasonable doubt as to whether Doug intentionally violated the order by sending those messages or whether he merely attempted to comply with the order, by obtaining written confirmation that [Prior Customer] was not a current customer, after [Prior Customer] initiated contact with Doug."

¶77   The TKS parties acknowledge that if Prior Customer was the one who initiated contact with Doug, "it is unclear how Doug could have handled [the situation] differently" and that when Doug subsequently emailed Prior Customer, Doug "was apparently trying to determine whether [he] was a 'current' customer or a prospective customer." Yet the TKS parties appear to argue that because Doug's email asking Prior Customer "how long he had been working with TKS" was sent three days after Doug was served with the motion for contempt sanctions, the email must have amounted to an intentional failure by Doug to

comply with the Stalking Injunction. Specifically, they apparently contend that because "Doug knew Troy considered his communications with [Prior Customer] to be a violation of the Stalking Injunction" yet "reached out to him anyway," it was clear error for the court not to find that Doug intentionally violated the No Contact Order when he emailed Prior Customer. We are not convinced.

¶78    Nothing in the record suggests that Doug trusted Troy or the assertions of Troy's counsel. Accordingly, the fact that Doug learned that Troy and Troy's counsel considered communications with Prior Customer to be a violation of the Stalking Injunction does not definitively establish that Doug intentionally violated the Stalking Injunction by inquiring of Prior Customer himself whether he was a current customer of TKS, especially where he told Doug that he was not a current customer. Given the evidence that Doug repeatedly told Prior Customer that Doug could not speak with him if he was a TKS customer and the evidence that Doug's email to Prior Customer was merely to confirm whether he was a current customer, we see no clear error in the district court's finding that the TKS parties failed to prove beyond a reasonable doubt that by communicating with Prior Customer Doug intentionally violated the Stalking Injunction. That alleged violation of the Stalking Injunction cannot serve as a basis for holding Doug in contempt.

2.    Doug's Facebook Post and Related Comments

¶79    We now consider the TKS parties' challenge to the court's determination that Doug's Facebook post and related comments did not satisfy the elements of contempt. While the Stalking Injunction was in place, Doug made a series of communications on Facebook. The full text of those communications is quoted above. *See infra* ¶ 18. We address, in turn, the district court's determination that these communications did not violate the No Contact Order and its determination that they did not violate the Personal Conduct Order.

a.   Whether Doug's Facebook Post and Comments Violated the No Contact Order

¶80   The Stalking Injunction's No Contact Order forbade Doug from communicating with Troy, even indirectly. For the district court to impose contempt sanctions based on the allegation that the Facebook communications violated the No Contact Order, the TKS parties had to prove beyond a reasonable doubt that, among other things, Doug intended the Facebook post and comments to be a direct or indirect communication with Troy or that he knew they were a direct or indirect communication with Troy. *See Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991). The district court determined that it could not find beyond a reasonable doubt that the Facebook post was an intentional or knowing violation of the No Contact Order, and we see no clear error in that finding.

¶81   On this point, the court reasoned that "because Troy was not a Facebook friend of Doug and because the message [did] not reference Troy by name, a reasonable doubt exists as to whether Doug intended the message to reach Troy." Indeed, there was evidence that Troy was not a Facebook friend with Doug, which does support a finding that the post was not a knowing or intentional attempt by Doug to communicate with Troy directly. And there is no evidence that any of Doug's Facebook friends routinely shared Doug's posts with Troy, which supports a finding that the post and related comments did not amount to a knowing or intentional attempt to communicate with Troy indirectly.

¶82   Admittedly, we have held in the context of a no-contact order that "a factfinder could readily infer that calls [an ex-husband] placed to [his ex-wife's new husband] . . . would routinely and predictably be conveyed to [the ex-wife]" and, therefore, that by making those calls, the ex-husband "intentionally or knowingly" contacted his ex-wife at least

indirectly. *State v. Fowers*, 2023 UT App 128, ¶ 13, 538 P.3d 1274 (cleaned up). Similarly, we have held that a factfinder could infer that an estranged husband intended to communicate with or contact his wife, who had obtained a protective order against him, by sending letters with language directed to his wife to the address of the wife's "sister who lived next door." *State v. Fouse*, 2014 UT App 29, ¶¶ 3, 41, 43, 319 P.3d 778, *cert. denied*, 329 P.3d 36 (Utah 2014). But in neither of those cases did we say that the evidence *required* a finding that the defendant knowingly or intentionally communicated indirectly with the protected person. *See Fowers*, 2023 UT App 128, ¶ 13; *Fouse*, 2014 UT App 29, ¶ 43. And we are unwilling here to hold that a person who is subject to an order not to contact his or her sibling indirectly necessarily violates that order any time he or she communicates about the sibling with any other family member or friend of the sibling.

¶83   In short, we affirm the district court's determination that Doug's Facebook post and related comments did not violate the No Contact Order.

b.      Whether Doug's Facebook Post and Comments Violated the Personal Conduct Order

¶84 The TKS parties allege that Doug's Facebook communications violated the Stalking Injunction's Personal Conduct Order because he was thereby communicating "about" Troy. On this issue, Judge Harris's opinion, joined in by Judge Orme, is the majority opinion; my views in this Part II.B.2.b constitute a dissenting opinion on this issue.

¶85   As to the allegation that Doug's Facebook post and comments violated the Stalking Injunction's Personal Conduct Order, I address each of the elements of contempt in turn. Again, those elements include that Doug "knew what was required [of him by the Personal Conduct Order], had the ability to comply, and intentionally failed or refused to do so." *Von Hake v. Thomas*,

759 P.2d 1162, 1172 (Utah 1988), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991).

(i) Whether Doug Knew What Was Required

¶86    The Personal Conduct Order said:

> Doug is not to stalk Troy. This means that Doug must not do things such as follow, threaten, annoy, or harass Troy in a way that could cause a reasonable person to suffer emotional distress or to be afraid for the person's safety or the safety of another person. For a legal definition of stalking, see Utah Code Ann. § 76-5-106.5.

The district court found that "no evidence exists [that] Doug knew speaking indirectly about Troy would violate the order." In making this finding, the court reasoned that while the Personal Conduct Order "contains a citation" to Utah Code section 76-5-106.5 "for the legal definition of stalking" and while "the statute contains a provision precluding an enjoined party from communicating 'about' the protected party," the Stalking Injunction "does not contain that language, and no evidence exists in the record that Doug Wilson ever consulted the statute." I believe this approach was erroneous.

¶87    The Personal Conduct Order prohibited Doug from stalking Troy. The supplied list of actions that constitute stalking was not exhaustive, as evidenced by the order's use of "such as." *See State v. Green*, 2023 UT 10, ¶ 70, 532 P.3d 930 (explaining that a rule's "use of 'such as' indicates that the list" following that phrase is "illustrative and not exclusive" (cleaned up)); *State v. Verde*, 2012 UT 60, ¶¶ 14–15, 296 P.3d 673 (discussing a list following "such as" as "illustrative and not exclusive"), *abrogated on other grounds by State v. Thornton*, 2017 UT 9, 391 P.3d 1016. Thus, the fact that communicating about Troy was not among the listed examples of stalking is not dispositive.

¶88     Furthermore, the Personal Conduct Order unambiguously stated that the legal definition of stalking could be found in Utah Code section 76-5-106.5. I have some doubt as to whether Doug could successfully claim ignorance on the meaning of stalking even if the stalking statute had not been explicitly cited in the Personal Conduct Order, because "citizens are generally presumed to know what the law is." *Laker v. Caras*, 2023 UT App 125, ¶ 21, 538 P.3d 926. At any rate, however, Doug's argument that he only knew of the listed examples of stalking and not the full definition of stalking is unavailing given that he was plainly forbidden from stalking and told where to find the definition of that term. *Cf. State v. Barlow*, 153 P.2d 647, 653 (Utah 1944) ("Ignorance of a fact may sometimes be taken as evidence of a want of criminal intent, but not ignorance of the law."). I reject the district court's position that a person subject to a court order not to engage in certain conduct does not know what is required if the person elects not to read a statute that defines the forbidden conduct that is expressly identified in the order. Accordingly, I would vacate the district court's finding that "no evidence exists [that] Doug knew speaking indirectly about Troy would violate the [Personal Conduct Order]," remand the case, and instruct that the court make a new finding on this issue.

### (ii) Whether Doug Was Able to Comply

¶89     As the TKS parties point out, the district court did not make a finding regarding Doug's ability to comply with the Personal Conduct Order's restriction against communicating about Troy. However, while it is true that a "district court must make explicit findings, whether written or transcribed, on the three elements of contempt," *Koehler v. Allen*, 2020 UT App 73, ¶ 14, 466 P.3d 738 (cleaned up), I would find the lack of an explicit finding on this element to be harmless, *see generally Green*, 2023 UT 10, ¶ 101 ("[W]hen an error is harmless, we do not disturb the district court's decision."). Because there is simply no evidence to suggest that Doug would have been unable to refrain from posting about

Troy on Facebook, the only supportable finding on this point is that Doug could have complied with the Personal Conduct Order.

### (iii) Whether Doug Intended Noncompliance

¶90 On the element of whether Doug knowingly or intentionally violated the Personal Conduct Order, the district court found that "because no evidence exists [that] Doug knew speaking indirectly about Troy would violate the order, a reasonable doubt exists as to whether Doug intended the [Facebook post and related comments] to violate[] the order." I have already expressed my view that the court's finding of no evidence that Doug knew communicating about Troy would violate the Personal Conduct Order was the product of legal error. *See supra* ¶¶ 86–88. Because I would have thus vacated this basis for the court's finding that Doug did not knowingly or intentionally violate the Personal Conduct Order through his Facebook post and related comments, I would vacate the court's finding on this point as well.

¶91 Doug contends that there is evidence apart from his professed ignorance of the restrictions imposed by the Personal Conduct Order that supports a finding that he did not knowingly or intentionally violate that order with his Facebook communications. Specifically, he asserts that the post and comments were not knowingly or intentionally "about" Troy but, instead, "only about" Sister. I am skeptical on this point. While the Facebook post and comments may have been, in part, about Sister, that does not necessarily mean they were not also about Troy. They refer to the lawsuit and the request for the Stalking Injunction, neither of which was filed by Sister. Additionally, the Facebook post declares, "I have . . . [h]ad family members try to hurt me to the point to drive me to take my life." And Doug's suicide note stated: "I feel like there is no other way out of where Troy has put me. I do not have the will or strength to fight." Doug explicitly blamed Troy for his suicidal thoughts, so I am doubtful that his Facebook reference to the "family members" who

prompted such thoughts was not intended to be about Troy. For these reasons, I do not believe that we can say that the evidence supported only the district court's finding that Doug did not knowingly or intentionally violate the Personal Conduct Order through his Facebook post and related comments. I would instruct the court to make a new finding on this issue on remand as well.

¶92 In the context of stalking, this third element of contempt—that the stalker intentionally failed or refused to comply with the court's order, *see Von Hake v. Thomas*, 759 P.2d 1162, 1172 (Utah 1988), *superseded on other grounds as recognized in State v. Hurst*, 821 P.2d 467 (Utah Ct. App. 1991)—required the TKS parties to also prove that, to the extent the Facebook post and comments were about Troy, the communications would have caused "emotional distress to a reasonable person in [Troy's] circumstances,"[11] *Baird v. Baird*, 2014 UT 08, ¶ 25, 322 P.3d 728; *see also* Utah Code § 76-5-106.5(2). The district court found that "a reasonable doubt exists as to whether a reasonable person in Troy Wilson's position, rather than an inordinately sensitive person, would suffer emotional distress because of that singular Facebook post." I would conclude that the court's approach that led to this finding suffered from a legal error and that the court exceeded its discretion when it excluded certain evidence related to this finding.

¶93 A determination of whether Doug's Facebook post and comments would have caused emotional distress involves an "objective inquiry into whether [Doug's] conduct would have caused a reasonable person in [Troy's] circumstances emotional distress." *Baird*, 2014 UT 08, ¶ 21. This objective inquiry is "an individualized objective" inquiry, "meaning that a court must consider the entire context surrounding the [alleged stalker's]

---

11. The TKS parties do not argue that the Facebook post and comments would have caused a reasonable person in Troy's position to fear for his or her safety or the safety of a third person.

conduct," *Anderson v. Deem*, 2023 UT App 48, ¶ 29, 530 P.3d 945 (cleaned up), including, as we have already noted, "such factors as the victim's background, the victim's knowledge of and relationship with the defendant, any history of abuse between the parties, the location of the alleged stalking, . . . the cumulative effect of the defendant's repetitive conduct[, and] whether the behavior might cause damage to one's reputation, relationships, or livelihood," *Richins v. Weldon*, 2023 UT App 147, ¶ 67, 541 P.3d 274 (cleaned up); *see also State v. Miller*, 2023 UT 3, ¶¶ 84, 86, 527 P.3d 1087; *Ragsdale v. Fishler*, 2021 UT 29, ¶ 45, 491 P.3d 835; *Baird*, 2014 UT 08, ¶ 27. "In this context, acts that seem perfectly innocent or even well intentioned may constitute stalking. For example, conduct such as sending the victim a dozen roses may seem benign and loving to the casual observer, but could mean a very different thing when understood in the context of the victim's experience." *Ragsdale*, 2021 UT 29, ¶ 45 (cleaned up). Moreover, courts "must consider the conduct cumulatively." *Id.* (cleaned up).

¶94 At the outset of the contempt hearing, the district court expressly stated its view that "the facts that gave rise to" the Stalking Injunction were "beyond the scope" of the contempt proceeding. As the majority opinion on this issue points out, the court thereafter did say that it would "take judicial notice of the [Stalking Injunction] and the findings that [the previous judge] made in relation to . . . issuing" it, and the court admittedly had before it evidence of many of the circumstances surrounding the controversy in general. However, *after* the court expressed its willingness to take judicial notice of the Stalking Injunction and the findings that the previous judge had made in relation to it, the court again affirmed its view that "the scope of [the contempt] proceeding" allowed it to consider only the "limited allegations of the order [to show cause]," not the circumstances surrounding the issuance of the Stalking Injunction in the first place. If we take the district court at its word—and I do—even if it took judicial notice of the findings that the previous judge made in relation to

the Stalking Injunction, it did not *consider* those facts when ruling on the contempt motion.

¶95 A conclusion that the district court did not properly consider the entire context surrounding Doug's conduct is further supported by an evidentiary ruling the court made at the contempt hearing. Specifically, the court limited testimony at the hearing to "testimony in regards to the allegations in the contempt proceeding." While a judge who presides over both a stalking injunction hearing and a subsequent contempt hearing may not need to rehear evidence of the events leading to the stalking injunction to be able to fulfill its charge to consider the entire context surrounding the stalker's conduct when deciding the contempt issue, in this case the same judge did not preside over both hearings. And because the first judge's findings fell far short of telling the whole story of the parties' history, the second judge's willingness to take judicial notice of those findings was insufficient to demonstrate that it met its charge. For example, the TKS parties alleged various misdeeds by Doug that the first judge did not discuss when determining whether there was a course of conduct justifying issuance of the Stalking Injunction. *See supra* ¶¶ 9, 13–16. Accordingly, I believe the court abused its discretion by excluding from the contempt hearing evidence of the events surrounding the issuance of the Stalking Injunction on the basis that it was irrelevant to the contempt proceeding. And that abuse of discretion further confirms that the district court did not properly consider the entire context surrounding Doug's conduct when it ruled on the contempt issue.

¶96 The majority opinion on this issue begins by correctly reciting "a few background concepts," including the standard of review related to a district court's factual findings and the burden of proof related to criminal contempt. *Infra* ¶¶ 103–05. But as the majority opinion on this issue recognizes, those concepts come into play only if "a district court applies the correct legal standard." *Infra* ¶ 103. And the correct legal standard was whether, *considering the entire context*, Doug's Facebook post and

comments would have caused a reasonable person in Troy's position emotional distress. And, as explained, it is the district court's repeatedly expressed intention not to consider the entire context that undergirds my opinion on this issue.

¶97 The majority opinion on this issue also states, alternatively, that, even assuming the district court did not consider the entire context surrounding Doug's Facebook post and comments, no reasonable factfinder who had considered the entire factual context could conclude beyond a reasonable doubt that Doug's Facebook post and comments were more than a "blip on the radar screen" and were capable of causing a person in Troy's position emotional distress. *Infra* ¶¶ 107, 113. I disagree. As already noted, even the "seem[ingly] . . . innocent" or "well intentioned" "sending [of] . . . a dozen roses" might, in some circumstances, constitute a violation of a stalking injunction "when understood in the context of the victim's experience." *Ragsdale*, 2021 UT 29, ¶ 45 (cleaned up). In light of that, and given the established context of "division," "escalated" tensions, and "great turmoil" into which the Facebook post and comments were placed, I am not prepared to hold as a matter of law that no reasonable factfinder considering the entire context could determine that the post and comments would cause an ordinary person in Troy's position emotional distress.

¶98 For the foregoing reasons, I would vacate the court's finding as to whether Doug's Facebook post and comments would cause a reasonable person in Troy's position emotional distress and direct that the court make a new finding on this issue as well.[12]

---

12. The TKS parties also contend that "[t]he district court erred in categorically finding that 'all of the witnesses from [the] Wilson family possess such significant biases that the court cannot credit any of their testimony beyond a reasonable doubt.'" However,

(continued…)

CONCLUSION

¶99　We have jurisdiction over Doug's appeal. As to his appeal, the district court did not interpret or apply the stalking statute erroneously when it found a course of conduct directed at Troy. The court's finding that Doug knew or should have known that his course of conduct would cause a reasonable person in Troy's position emotional distress was not clearly erroneous. And the court did not abuse its discretion by dismissing the TKS parties' tort claims without prejudice.

¶100　As to the TKS parties' appeal, we unanimously affirm the district court's determinations to apply the criminal standard in the contempt proceedings and to not hold Doug in contempt for communicating with Prior Customer. Additionally, based on Judge Harris's opinion, joined by Judge Orme, we also affirm the district court's determination to not hold Doug in contempt based on the allegation that his Facebook post and comments violated the No Contact Order.

---

HARRIS, Judge (concurring in part and authoring the Opinion of the Court as to Part II.B.2.b, in which ORME, J., joined):

¶101　Judge Orme and I join the first 83 paragraphs of the lead opinion without reservation. That is, we agree that this court has jurisdiction over Doug's appeal—as a direct appeal and not as a

---

"the factfinder serves as the exclusive judge of both the credibility of witnesses and the weight to be given particular evidence." *State v. Jok*, 2021 UT 35, ¶ 28, 493 P.3d 665 (cleaned up). This includes when the trial court is the factfinder. *See In re J.R.H.*, 2020 UT App 155, ¶ 17, 478 P.3d 56 ("Trial courts . . . have wide latitude to make credibility determinations, and we defer to such determinations . . . ."). Hence, I believe the TKS parties have not demonstrated error on this point.

cross-appeal—and that, on the merits of that appeal, the district court did not err in issuing the Stalking Injunction, nor did it abuse its discretion in dismissing the TKS parties' tort claims without prejudice. We also agree that, with regard to the TKS parties' appeal, the district court correctly treated the motion for contempt sanctions as a motion to hold Doug in *criminal* contempt rather than *civil* contempt, and we further agree that the court did not commit reversible error either (a) in finding that Doug's communication with Prior Customer was not contemptuous or (b) in determining that Doug's Facebook communications did not violate the No Contact Order. To that extent, we concur fully in the lead opinion.[13]

¶102 We disagree, however, with the lead opinion's conclusion that the district court committed reversible error in determining that the TKS parties had not proved, beyond a reasonable doubt, that Doug's Facebook communications violated the Personal Conduct Order. In particular, we take issue with the lead opinion's assessment regarding the emotional distress component of the analysis. On that score, we agree wholeheartedly with the district court's determination that "reasonable doubt exists as to whether a reasonable person in Troy Wilson's position, rather than any inordinately sensitive person, would suffer emotional distress because of that singular Facebook post." On that basis, we affirm the judgments of the district court in their entirety, a result

---

13. Moreover, we take no issue with the lead opinion's analysis in paragraphs 86 through 88, in which the lead opinion expresses a desire to "vacate the district court's finding that 'no evidence exists [that] Doug knew speaking indirectly about Troy would violate the [Personal Conduct Order].'" But our affirmance of the court's emotional distress determination is, by itself, sufficient to conclude our analysis on the overarching question of whether Doug's Facebook communications violated the Personal Conduct Order; thus, Judge Orme and I do not need to specifically assess the other elements contained in Part II.B.2.b of the lead opinion.

that will bring this case to a well-deserved conclusion and present no need for further proceedings on remand.

¶103   Let us begin with a few background concepts, starting with the applicable standard of review. Assuming that a district court applies the correct legal standard—an "individualized objective standard," *see Baird v. Baird*, 2014 UT 08, ¶ 26, 322 P.3d 728—its determination regarding whether a claimant suffered the sort of emotional distress the stalking statute contemplates is a factual finding that we review only for clear error. *See Richins v. Weldon*, 2023 UT App 147, ¶ 42, 541 P.3d 274 (reviewing an emotional distress finding, in this context, "for clear error" (cleaned up)). In this case, the district court applied the correct standard, expressly asking whether "a reasonable person in Troy Wilson's position, rather than any inordinately sensitive person," suffered emotional distress. Accordingly, the court's ultimate finding regarding emotional distress is, in this case, a determination we review only for clear error.

¶104   Moreover, the overarching standard of review generally applicable in contempt cases is quite deferential. Indeed, the lead opinion, *supra* ¶ 36, acknowledges that—regardless of whether the case involves civil or criminal contempt—a district court's "decision to hold a party in contempt of court rests within the sound discretion of the trial court and will not be disturbed on appeal unless the trial court's action is so unreasonable as to be classified as capricious and arbitrary, or a clear abuse of discretion." *Anderson v. Thompson*, 2008 UT App 3, ¶ 11, 176 P.3d 464 (cleaned up).

¶105   We also note that the TKS parties were seeking *criminal* contempt, not civil contempt, and therefore they were required to prove Doug's contempt beyond any reasonable doubt. *See supra* ¶¶ 69–73. This is the most stringent burden of proof found in the law, and the district court recognized this concept in its ruling.

¶106 Furthermore, the type of emotional distress at issue here is something far greater than mere annoyance. Utah's stalking statute—incorporated into the Personal Conduct Order—defines "[e]motional distress" to mean "significant mental or psychological suffering." Utah Code § 76-5-106.5(1)(a)(ii)(A) (2021). This court has previously noted that this definition requires claimants to demonstrate that they have suffered more than just "some emotional distress." *See Noel v. James*, 2022 UT App 33, ¶ 20, 507 P.3d 832; *see also Meyer v. Aposhian*, 2016 UT App 47, ¶ 16, 369 P.3d 1284 (affirming a district court's determination that the incidents in question, while "upsetting, intimidating, and annoying," were not sufficient to cause the sort of emotional distress contemplated by the stalking statute).

¶107 With these foundational principles in mind, we see no error at all—let alone a clear one—in the district court's determination that "reasonable doubt exists as to whether a reasonable person in Troy Wilson's position, rather than any inordinately sensitive person, would suffer emotional distress because of that singular Facebook post." In the grand scheme of this family's lengthy dispute, this Facebook post was merely a blip on the radar screen, and the district court was well within its contempt-case discretion to determine that the TKS parties hadn't proved, beyond a reasonable doubt, that—of all things in this case's history—it was these rather innocuous Facebook communications that tipped Troy over the emotional edge into "significant mental or psychological suffering."

¶108 The lead opinion's inclination to reverse and remand on this point appears largely driven by the district court's (perhaps somewhat ill-considered) remarks that "any of the facts that gave rise to" the Stalking Injunction were "beyond the scope" of the contempt proceeding. In our view, one reasonable reading of the court's remarks is simply that it did not want to unduly elongate the evidentiary hearing by having witnesses come in and rehash the same testimony they'd given under oath some nine months earlier. Indeed, at one point the court referred to its request—

made previous to the contempt hearing—that "the parties . . . provide declarations of any witnesses," and it stated that it had made that request in an attempt "to avoid going back to other proceedings and trying to listen to the" audio recording of the previous hearing. Nevertheless, the lead opinion has decided to "take the district court at its word" and assume that, because of these remarks, the court "did not properly consider the entire context surrounding" Doug's Facebook communications. *See supra* ¶¶ 94–95.

¶109 Our reading of the record is different from the lead opinion's. As we see it, the district court actually did consider the entire context of the case in making its contempt ruling, even if it refused to allow additional testimony and evidence to be re-presented at the hearing. At the contempt hearing, during the debate over the scope of the witnesses' testimony, the court noted that "there is a record with regard to" what had happened at the previous hearing that could be reviewed and consulted. The court then expressly took "judicial notice of the fact that there were prior proceedings" and "judicial notice of the [Stalking Injunction] and the findings" the prior judge made in entering it. Our reading of this exchange is that the court was not just taking judicial notice of the Stalking Injunction and related findings made by the previous judge, but of the "record with regard to" the previous hearing. Indeed, in its contempt order, the district court expressly stated that it had considered "the circumstances surrounding the case at bar" that had "created great turmoil in the extended Wilson family."

¶110 Moreover, during that same debate, Troy's counsel noted that Troy had submitted a lengthy declaration in advance of the contempt hearing, with the intent of informing the court about "what [Troy] had experienced prior to" the entry of the Stalking Injunction. That declaration was just one of many exhibits submitted by the parties with their briefing in advance of the contempt hearing; that briefing, including the exhibits, contained a whole lot of context and descriptions of past underlying events.

Unless this court is aware of some indication to the contrary, it should presume that lower courts read the relevant briefing, including the submitted exhibits, before rendering a decision. *See, e.g.*, *Merrick Young Inc. v. Wal-Mart Real Estate Bus. Trust*, 2011 UT App 164, ¶ 29, 257 P.3d 1031 (noting the lower court's statement that it had "fully reviewed this matter" before making its ruling, and "presum[ing]" therefrom that the court "closely examined all of the documents filed in support of the parties'" positions). Here, the district court stated, at the hearing, that it had "received and reviewed all the declarations" submitted by the TKS parties, and it indicated in its final written ruling that it "took evidence and received briefing from the parties" and that it was "fully advised in the premises" before making its ruling. We therefore presume that the district court read all the material Troy submitted in support of his motion.

¶111   In addition, at the contempt hearing, the court heard live testimony not only from Troy but also from several other witnesses, including at least four other members of the family. Two of those witnesses—Troy and his sister—offered testimony about Troy's reaction to Doug's Facebook communications.

¶112   In our view, it is nigh on impossible to read the file in this case well enough to be able to rule on a contempt motion and *not* be fully aware of the circumstances surrounding the controversy in general and the Facebook communications in particular. Here, the district court not only read the file but then presided over an evidentiary hearing at which live testimony was presented and these matters were further discussed. We therefore reach a different conclusion than the lead opinion; as we see it, the district court considered all the relevant contextual circumstances before concluding that the TKS parties had not met their burden of proving that Troy had suffered emotional distress.

¶113   But be all of that as it may, even if we were to assume for purposes of the discussion that the district court truly did not consider the entire context surrounding Doug's Facebook

communications, the parties have—in this appeal—provided this court with all of that context, through briefing and citations to the record, and *we* have certainly considered that contextual evidence. After undertaking that consideration, we are of the view that—to the extent the district court actually failed to consider the underlying circumstances—any error on the part of the court here was harmless. In our view, no reasonable factfinder, after considering the contextual evidence to which the TKS parties now point, could conclude beyond a reasonable doubt that Doug's "John Dough" Facebook posts caused a reasonable person in Troy's position to suffer the sort of significant emotional distress contemplated by the stalking statute.

¶114 Accordingly, for all these reasons, we part ways with the lead opinion's analysis in paragraphs 90 through 98. On this record, reasonable doubt exists as to whether a reasonable person in Troy's shoes would have sustained significant mental or psychological suffering from Doug's Facebook posts. The district court's contempt ruling was sound, and we therefore affirm it. Because we agree with the lead opinion's analysis affirming the court in all other respects, the court's rulings are affirmed across the board.

_____