2025 UT App 8

# THE UTAH COURT OF APPEALS

MATTHEW MORTENSEN AND MAKAY MORTENSEN,
Appellees,
*v.*
MAYNE MORTENSEN,
Appellant.

Opinion
No. 20230417-CA
Filed January 24, 2025

Fourth District Court, Nephi Department
The Honorable Anthony L. Howell
No. 190600033

Kathryn J. Steffey, Clayton H. Preece, and Richard S.
Snow, Attorneys for Appellant

Mitchell A. Stephens and Justin L. James,
Attorneys for Appellees

JUDGE RYAN D. TENNEY authored this Opinion, in which
JUDGES GREGORY K. ORME and AMY J. OLIVER concurred.

TENNEY, Judge:

¶1　This case involves a lawsuit that two brothers, Matthew (Matt) and Makay Mortensen, filed against a third brother, Mayne Mortensen.[1] In their suit, Matt and Makay sought specific performance of an oral agreement that they had with Mayne, wherein Mayne had agreed to split any proceeds he received from a few parcels of real property that he'd inherited from their father. Mayne denied that any such agreement existed, and while the suit was pending, Mayne sold one of the parcels at issue. After a bench

---

1. Because the parties and many others involved in this case share the same last name, we'll refer to them by their first names, and we mean no disrespect by the informality.

trial, the district court ruled that a "valid and enforceable contract exist[ed]" and that Mayne had breached that contract by not giving Matt and Makay a share of the proceeds from the recent sale. The court accordingly awarded damages to Matt and Makay.

¶2 Mayne now appeals, arguing that (1) the court erred in concluding that any oral agreement that may have existed between the brothers was supported by consideration, (2) the court made inadequate findings to support its conclusion that there had been a meeting of the minds, and (3) the court erred in concluding that the sale of one of the properties had triggered Mayne's obligations under the oral agreement. For the reasons set forth below, we reject each argument and affirm.

BACKGROUND[2]

¶3 Makay, Matt, and Mayne are brothers (collectively, the Brothers). Their father, Larry Mortensen, passed away in March 2011. When Larry died, his estate consisted primarily of four parcels of real property—two of them were in Juab County, one was in Millard County, and one was in Tooele County.

---

2. As a general rule, "on appeal from a bench trial, we view the evidence in the light most favorable to the district court's findings." *In re Western Ins. Co.*, 2022 UT 38, ¶ 7 n.1, 521 P.3d 851 (quotation simplified). As will be discussed below, the district court in this case issued a ruling after a bench trial that included a comprehensive set of factual findings, and no party has argued on appeal that any factual finding was not supported by sufficient evidence. We'll accordingly "recite the facts of the case as they are represented in the district court's order and trial transcript." *Id.* And we further note that, unless otherwise indicated, direct quotations in our recitation of the Background are drawn directly from the court's unchallenged findings.

¶4 During Larry's life, he "represented to the Brothers that his estate would be split equally among the Brothers." In addition, during the course of divorce proceedings in 2006 between Larry and Melony Mortensen (who is the Brothers' mother), Larry represented to Melony "that he would split his estate equally among their three sons." Based on Larry's representations, "Melony made concessions in [their] divorce that she would not have otherwise made, including allowing Larry to take the Millard, Juab, and Tooele County properties," which resulted in Larry receiving a "grossly disproportionate" split of the marital property.

¶5 Unbeknownst to Matt, Makay, or Melony, Larry executed a will in 2007 (the 2007 Will). Under the terms of the 2007 Will, Larry left nothing to Matt or Makay, instead leaving the entirety of his estate to Mayne. Makay was listed, however, as the alternate beneficiary of the estate if Mayne did not survive Larry.

¶6 In February 2011, after years of battling Parkinson's disease and just one month before his death, Larry executed a new will and an accompanying trust (collectively, the 2011 Will). The 2011 Will revoked all prior wills (including the 2007 Will), named Mayne as Larry's personal representative, and "gave substantially all of [Larry's] assets to Mayne," leaving "very little to Matt and Makay."[3] At the same time, Larry "executed a power of attorney, giving Mayne Larry's power of attorney." As with the 2007 Will, Matt, Makay, and Melony were unaware that Larry had effectively disinherited Matt and Makay in the 2011 Will.

¶7 A month or two after Larry's death, "Mayne organized a meeting with Matt, Makay, Melony, and Larry's estate planning attorney to have" the terms of the 2011 Will "described to Matt, Makay, and Melony." As "the personal representative of Larry's

---

3. Under the terms of the 2011 Will, Matt and Makay each received $5,000 and a few guns.

estate," Mayne "was very much aware of" the contents of this will "prior to [its] reading." Yet "Mayne said nothing to any of his family and continued to allow them to believe Larry's estate would be split equally."

¶8      "After Matt and Makay learned about their disinheritance and Melony learned about Larry's broken promise to her, the family held numerous discussions in order to resolve the problem." "Mayne, as both 1) an attempt to assuage the concerns that Matt, Makay, and Melony had, and 2) to avoid litigation between Mayne and Matt, Makay, and/or Melony, promised all three of them that the estate would be split equally between the Brothers." "Specifically, Mayne offered to split the liquid proceeds as well as any proceeds derived from the real property equally among Matt, Makay, and Mayne." Mayne offered as much because he "knew his brothers had or believed they had a potential claim against him and Larry's estate, both directly and as third-party beneficiaries of Melony's agreement with Larry," and he also "knew that Melony had or believed she had potential claims against Larry's estate for the disinheritance of Matt and Makay."

¶9      "Matt, Makay, and Melony, accepted the offer and performed their obligations by forgoing their challenges to Larry's bequeathment." However, "in the years to come, Mayne decided to disregard the contract."

¶10     In 2019, Matt and Makay sued Mayne, asserting causes of action for declaratory judgment, specific performance, and quiet title, all of which centered on their assertion that, under their prior agreement, they were entitled to an equal ownership interest in the properties. Mayne filed a motion to dismiss, arguing that Matt and Makay's claims violated the statute of frauds and relied on an interest in real property that did not exist. The district court granted Mayne's motion to dismiss in part; in particular, it

dismissed the specific performance and declaratory judgment claims because they were barred by the statute of frauds.

¶11 Matt and Makay then amended their complaint. In addition to the ownership claims that they'd originally asserted, they now asserted in the amended complaint that there had been an oral agreement that "the proceeds of any Estate property would be split 1/3 each at the time of the transfer of that property to a third-party," and they accordingly added a claim for breach of that contract, alleging that Mayne had "refus[ed] to transfer to [them] 2/3 of the value of income derived from the Estate."

¶12 After Matt and Makay had filed the amended complaint, and while discovery was ongoing in the case, Mayne "sold the Tooele County Property for $2 million." Instead of splitting the proceeds with Matt and Makay, Mayne used the proceeds in a so-called "1031 exchange," wherein the funds were used to "purchase new property in Juab County as well as a condominium in Utah County, all separate transactions with different parties." At trial, Mayne testified that to facilitate this transaction, the proceeds from the sale of the Tooele property were placed into escrow and then used to fund the purchase of the new properties.[4]

---

4. For background, we note that a "1031 exchange" is governed by section 1031 of the Internal Revenue Code. *See generally* 26 U.S.C. § 1031. This type of "exchange is a real estate transaction in which a taxpayer sells real estate held for investment or for use in a trade or business and uses the funds to acquire replacement property." *Exchanges Under Code Section 1031*, Am. Bar Ass'n, https://www.americanbar.org/groups/real_property_trust_estate /resources/real-estate/1031-exchange/ [https://perma.cc/W5V8-XY8D]. The taxpayer "enter[s] into an exchange agreement with an Accommodator," who "holds the funds and transfers to the

(continued…)

¶13   The district court later held a three-day bench trial, during which Matt, Makay, Mayne, and Melony all testified. The court later issued its final judgment, which included findings of fact and conclusions of law.

¶14   After issuing the findings of fact, which we've largely recited in this Background section, the court issued conclusions of law. As relevant to the issues raised in this appeal, those conclusions included the following:

- There was a "valid and enforceable contract" among the Brothers "for the equal distribution of proceeds upon the sale of land that passed from Larry's estate to Mayne."

- The "1031 exchange still resulted in a 'sale' of the Tooele property," thus making it subject to the Brothers' contract.

- "Mayne breached that contract when he sold the Tooele property for $2 million and failed to distribute proceeds to Matt and Makay."

- "Matt and Makay have suffered damages collectively in the principal amount of $1,333,333.33."

ISSUES AND STANDARDS OF REVIEW

¶15   Mayne raises three issues on appeal. First, he claims that the district court erred in concluding that the Brothers' oral agreement was supported by consideration. This issue involves a mixed standard of review. We give deference to the factual findings underlying the court's consideration analysis, *Randolph*

---

escrow for purchase of the [r]eplacement [p]roperty." *Id.* The benefit of a 1031 exchange is that it allows the capital gains taxes to be deferred. *See Knowlton v. Knowlton*, 2023 UT App 16, ¶ 39 n.7, 525 P.3d 898, *cert. denied*, 531 P.3d 730 (Utah 2023).

*v. State*, 2022 UT 34, ¶ 28, 515 P.3d 444, but the court's conclusion that "an act or forbearance constitutes consideration for a contract is a question of law that we review for correctness," *Peirce v. Peirce*, 2000 UT 7, ¶ 21, 994 P.2d 193.

¶16    Second, Mayne claims that the district court's findings were inadequate because the court failed to make findings regarding three "essential" terms of the contract. The question of whether a court's findings were "adequate to support the court's legal conclusions is reviewed for correctness as a question of law." *Lundahl Farms LLC v. Nielsen*, 2021 UT App 146, ¶ 41, 504 P.3d 735 (quotation simplified). As explained below, however, Mayne did not preserve this challenge, so there is no ruling from the district court for us to review.

¶17    Third, Mayne claims that the district court erred in concluding that he breached the oral agreement when he failed to distribute proceeds from the sale of the Tooele property to Matt or Makay. This is so, according to Mayne, because a 1031 exchange did not trigger his contractual obligations. This question ultimately turns on the interpretation of what the term "proceeds" means within the Brothers' contract. "The interpretation of a contract is a question of law, which we review for correctness, giving no deference to the ruling of the district court." *Richman & Richman LLC v. Redmond*, 2023 UT App 158, ¶ 18, 542 P.3d 130 (quotation simplified).

ANALYSIS

I. Lack of Consideration

¶18    Mayne first claims the district court erred in concluding that the Brothers' oral agreement was supported by consideration. We begin by noting that, in his brief, Mayne did not argue that the court's underlying factual findings were not supported by sufficient evidence, and Mayne confirmed during oral argument

that he was not challenging the findings on that basis. As a result, we accept those findings as true for purposes of this appeal. And on the basis of those findings, we reject Mayne's argument about the alleged lack of consideration.

¶19 "Consideration may be found when there is any act or forbearance bargained for and given in exchange for the promise of another." *Peirce v. Peirce*, 2000 UT 7, ¶ 21, 994 P.2d 193. "Any detriment" can support a promise, "no matter how economically inadequate." *DeMentas v. Estate of Tallas*, 764 P.2d 628, 632 (Utah Ct. App. 1988) (quotation simplified); *see also Healthcare Services Group, Inc. v. Department of Health*, 2002 UT 5, ¶ 17, 40 P.3d 591 ("There is consideration whenever a promisor receives a benefit or where a promisee suffers a detriment, however slight." (quotation simplified)). "Ordinarily, courts will not inquire into the adequacy of consideration unless it is so insufficient or illusory as to render enforcement of the contract unconscionable." *Reese v. Reese*, 1999 UT 75, ¶ 27, 984 P.2d 987; *see also JENCO LC v. SJI LLC*, 2023 UT App 151, ¶ 43, 541 P.3d 321 (noting that even a "peppercorn" "might constitute legally sufficient consideration under contract law").

¶20 Under the district court's findings, the thing that Matt and Makay agreed to give up was a potential lawsuit after they learned that they had been disinherited in the 2011 Will. Matt and Makay now argue that, as a matter of law, this act of forbearance was enough. By contrast, Mayne points to several cases from other jurisdictions that focused on whether the potential lawsuit had legal merit. In his view, Matt and Makay had no valid basis for suing him, so their agreement to forgo the potential suit was not sufficient consideration. As to the initial question of what can constitute consideration in such circumstances, we agree with Matt and Makay.

¶21 In *Golden Key Realty, Inc. v. Mantas*, our supreme court held that if "there is a bona fide dispute as to the amount due" between

two parties and one party agrees to accept a lesser amount, this agreement constitutes "sufficient consideration." 699 P.2d 730, 733 (Utah 1985). Of particular significance, the supreme court further held that the underlying dispute need not "be well-founded, so long as it is in good faith." *Id.* In several similar cases, our supreme court likewise held that the consideration question turns on whether there was a "good faith" dispute between the parties. *See, e.g., Estate Landscape & Snow Removal Specialists, Inc. v. Mountain States Tel. & Tel. Co.*, 844 P.2d 322, 326 (Utah 1992) (noting that the "correct standard for determining whether there is a bona fide dispute is" whether there is "a good-faith disagreement over the amount due under the contract," and such "disagreement need not be well-founded, so long as it is in good faith"); *Ashton v. Skeen*, 39 P.2d 1073, 1076 (Utah 1935) ("It is not necessary for the claim to be well founded, but it must be made in good faith, otherwise there is no consideration for an agreement to accept a less sum, and the agreement is void."); *Utah Nat'l Bank of Salt Lake City v. Nelson*, 111 P. 907, 916 (Utah 1910) (quoting a prior treatise for the proposition that "if claims thus compromised are each genuine and upheld in good faith, the fact that one of them is invalid does not avoid the compromise, and the validity or invalidity of the original claim is immaterial" (quotation simplified)).

¶22    In pushing for a slightly different standard, Mayne points out that these cases arose in the context of the accord and satisfaction doctrine. This is true, but Mayne has not persuaded us that this makes any meaningful difference as to the legal question before us. "Generally, formation of a contract requires an offer, an acceptance, and consideration," and in "the case of an accord and satisfaction, the consideration requirement is satisfied by the settlement of a dispute between the parties." *Wm. Douglas Horne Family Revocable Trust v. Wardley/McLachlan Dev., LLC*, 2013 UT App 129, ¶ 17, 304 P.3d 99 (quotation simplified); *see also Estate Landscape*, 844 P.2d at 326 ("[T]he parties' surrender of their legal

right to dispute the amount at issue supplies the consideration necessary to support the accord.").

¶23 That's essentially what happened here. In an ordinary accord and satisfaction case, there is a dispute between the parties and a party that believes that it is owed something then agrees to accept some amount in exchange for no longer pressing the claim. The cases then hold that this agreement satisfies the ordinary consideration element of a contract. Here, even if it's true that the dispute between Matt and Makay on the one hand and Mayne on the other wasn't the product of an initial contract, this doesn't mean that there was no dispute that could not be satisfied under similar legal principles. In other words, if it were true that Matt and Makay thought they had a good faith claim to properties that Mayne owned, and if Matt and Makay agreed to drop those claims in exchange for something, then the principles set forth above would apply, thus satisfying the consideration element.[5]

---

5. We regard the past accord and satisfaction cases from the Utah Supreme Court to be similar enough in spirit that they control our analysis here. But even so, we note that this approach is consistent with the approach taken by a Restatement section that addresses this question more particularly. There, the Restatement provides:

> (1) Forbearance to assert or the surrender of a claim or defense which proves to be invalid is not consideration unless
>   (a) the claim or defense is in fact doubtful because of uncertainty as to the facts or the law, or
>   (b) the forbearing or surrendering party *believes that* the claim or defense may be fairly determined to be valid.

Restatement (Second) of Contracts § 74 (Am. L. Inst. 1981) (emphasis added). Thus, like the approach we've adopted in this

(continued…)

¶24    So viewed, we turn to the next question: whether there was indeed a "bona fide dispute" between the parties, meaning that Matt and Makay had a "good faith" belief that they had some claim against Mayne. *Golden Key Realty*, 699 P.2d at 733. Under the district court's unchallenged factual findings, they did. Among the findings made by the district court, the following are particularly relevant to this question:

- During his life, Larry "represented to the Brothers that his estate would be split equally among the Brothers."

- During the course of divorce proceedings between Larry and Melony in 2006, Larry represented to Melony "that he would split his estate equally among their three sons." Based on Larry's representations, "Melony made concessions in [their] divorce that she would not have otherwise made, including allowing Larry to take the Millard, Juab, and Tooele County properties," which resulted in Larry receiving a "grossly disproportionate" share of the marital property.

- "After Matt and Makay learned about their disinheritance and Melony learned about Larry's broken promise to her, the family held numerous discussions in order to resolve the problem."

- "Mayne knew his brothers had or believed they had a potential claim against him and Larry's estate, both directly and as third-party beneficiaries of Melony's agreement with Larry."

- "Mayne, as both 1) an attempt to assuage the concerns that Matt, Makay, and Melony had, and 2) to avoid litigation

opinion, the Restatement likewise concludes, in part, that a party's willingness to forgo a potential suit can constitute valid consideration if the party *believes* that it has a valid claim.

. . . promised all three of them that the estate would be split equally between the Brothers. Specifically, Mayne offered to split the liquid proceeds as well as any proceeds derived from the real property equally among Matt, Makay, and Mayne."

- "Matt, Makay, and Melony, accepted the offer and performed their obligations by forgoing their challenges to Larry's bequeathments."

¶25 Taken together, these findings demonstrate that there was indeed a "bona fide dispute"—namely, Matt and Makay believed that they were entitled to an equal share of the estate, whether it be in reliance on the promises Larry made to them directly or instead as third-party beneficiaries of the promises he had made to Melony in the divorce. The findings also demonstrate that Mayne was aware of this belief, and they further demonstrate that Mayne agreed to specific concessions in exchange for an agreement from Matt and Makay not to press forward with their claims.

¶26 Even so, Mayne advances several arguments for why he believes these findings did not establish that there was consideration. We address each argument in turn.

¶27 First, Mayne points out that the district court did not enter a specific finding that Matt and Makay had a "good faith" basis for believing that they had a valid claim against Mayne or Larry's estate. But the cases we've cited above have not required a district court to talismanically utter the phrase "good faith" in order to support the determination that valid consideration was exchanged. In any event, even if such a finding were required, "unstated findings can be implied . . . if it is reasonable to assume that the trial court actually considered the controverted evidence and necessarily made a finding to resolve the controversy, but simply failed to record the factual determination it made." *In re A.S.*, 2024 UT App 52, ¶ 20 n.6, 548 P.3d 181 (quotation simplified),

*cert. denied*, 554 P.3d 988 (Utah 2024); *see also State v. Stewart*, 2019 UT 39, ¶ 27, 449 P.3d 59 (noting that the supreme court has "occasionally endorsed the propriety of a regime" in which an appellate court may "assume that the trier of facts found facts in accord with its decision despite the absence of express findings of fact" (quotation simplified)); *TKS Co-Pack Mfg., LLC v. Wilson*, 2024 UT App 87, ¶ 57 n.8, 552 P.3d 258 (concluding that an unstated finding was "implied" where it was "implicit" in findings that the court did make (quotation simplified)).

¶28    Here, as detailed in our list above, the district court expressly found that Larry promised Matt and Makay a portion of the estate (and that he made similar promises to Melony in divorce negotiations), that in the immediate wake of his death, Matt and Makay asserted their rights in "numerous discussions" with Mayne that were intended to "resolve the problem," that "Mayne knew his brothers had or believed they had a potential claim against him and Larry's estate," and that Mayne "offered to split the liquid proceeds as well as any proceeds derived from the real property equally" in exchange for their agreement to not file suit. From these findings, we think it's reasonable to assume that the district court impliedly found that Matt and Makay had a good faith basis for believing that they were entitled to a share of Larry's estate.

¶29    Second, Mayne suggests that Matt and Makay could not have had a good faith basis for filing suit because they had no valid claim. But again, according to our supreme court, it "is not necessary for the dispute to be well-founded, so long as it is in good faith." *Golden Key Realty*, 699 P.2d at 733.[6]

---

6. Regardless, even were we to conclude that the "good faith" component requires at least some threshold basis for the potential suit, Matt and Makay have cleared that hurdle here.

(continued…)

¶30 Third, Mayne argues that there was no consideration in this case because Matt and Makay never actually communicated to Mayne any threat to sue. But this argument runs headlong into the court's unchallenged findings. As noted, the court found that after Matt and Makay learned that they had been disinherited, the

---

In their brief, Matt and Makay argued that they could have brought a claim against Mayne for tortious interference with inheritance. Such claims are cognizable in Utah upon proof that (1) "the plaintiff had a reasonable expectation of receiving an inheritance or gift," (2) "the defendant committed an intentional and independent legal wrong," (3) the wrong was committed with the "purpose" of interfering "with the plaintiff's expectancy," (4) the "conduct caused the expectancy to fail," and (5) "the plaintiff suffered economic loss as a result." *In re Estate of Osguthorpe*, 2021 UT 23, ¶ 101, 491 P.3d 894 (quotation simplified). As noted, after the trial in this case, the district court found that Larry had "represented to the Brothers that his estate would be split equally," thus suggesting that Matt and Makay did indeed have an expectation of receiving a gift, and in their amended complaint, Matt and Makay asserted that the 2011 Will was "invalid due to" Mayne's "undue influence." Beyond this potential claim, they likewise asserted in their brief (with some support from the record) that they could have challenged the 2011 Will based on Larry's lack of testamentary capacity. And they further asserted that Melony herself might have had claims against the estate through her divorce (and that she likewise agreed to forgo those claims in exchange for Mayne's agreement with Matt and Makay) or, instead, that they may have been entitled to rely on Larry's assertions to Melony as third-party beneficiaries.

We need not and do not definitively weigh in on whether any of these claims would or should have succeeded. Again, what matters here is whether Matt and Makay had a good faith belief that they had a valid claim to the estate. Based on any of these potential claims, we think it's clear enough that they did.

---

family "held numerous discussions in order to resolve the problem." This, alone, plainly connotes that Matt and Makay were asserting that they thought they had a claim to the estate—otherwise, what would the "problem" even be, much less the point of having "numerous discussions" on how to "resolve" it? Moreover, in several findings, the district court found that Mayne then entered an oral agreement with his brothers for the specific purpose of heading off this potential litigation:

- "Mayne, as both 1) an attempt to assuage the concerns that Matt, Makay, and Melony had, and 2) *to avoid litigation . . .* promised all three of them that the estate would be split equally between the Brothers." (Emphasis added.)

- "Mayne did want *to avoid litigation*. That is why he made offers and promises to his family to appease them and avoid litigation. However, Mayne also wanted to keep the land for himself. Mayne lied to his family repeatedly, misrepresented his intentions, and engaged in dilatory tactics, all in order to deceive his family and string them along in order *to avoid a lawsuit*." (Emphases added.)

Together, these findings establish that Matt and Makay thought they had a claim to the estate and that Mayne was worried enough about this that he entered into the oral agreement in order to forestall that litigation. Regardless of what words Matt and Makay did or didn't use, this was enough to satisfy the bona fide dispute/good faith basis requirement set forth in Utah law.

¶31 Finally, Mayne argues that Matt and Makay's agreement to forgo a potential suit could not constitute valid consideration because they would not have benefitted from the potential suit. This is so, according to Mayne, because if Matt and Makay somehow persuaded a court to invalidate the 2011 Will, the 2007 Will would have then been operative, and the 2007 Will's terms were even more favorable to Mayne than those set forth in the 2011 Will. But again, the question is whether there was a bona fide

dispute, meaning that Matt and Makay had a good faith basis for asserting a claim. And on this front, the district court made an unchallenged finding that "[n]either Melony, Matt[], or Makay had any knowledge of Matt[] and Makay's disinheritance in Larry's 2007 or 2011 [W]ill." Consistent with this finding, Mayne testified at trial that he "never even told anyone or showed anyone [the 2007 Will] until this lawsuit was filed." Thus, given that Matt and Makay did not know about the 2007 Will, its terms are immaterial to the question of whether they had a good faith basis for later agreeing to not sue Mayne in exchange for dropping any claim against the 2011 Will.

¶32    In sum, the district court's unchallenged findings establish that Matt and Makay agreed to not sue Mayne in exchange for a share of the proceeds from the sale of any of the properties that Mayne received from Larry. On these facts, the district court did not err in ruling that, under Utah law, this forbearance could act as valid consideration.

## II. Adequacy of the Findings

¶33    Mayne next argues that the district court did not make adequate findings to support its conclusion that he breached the contract. This was so, according to Mayne, because the court did not find that there had been a meeting of the minds on three contract terms that Mayne now argues were "essential." We decline to address this argument on its merits, however, because it was not preserved.[7]

¶34    Under Utah law, there is a distinction between a challenge to the sufficiency of the evidence, which "asserts that there was insufficient evidentiary support for a particular factual finding,"

---

7. Matt and Makay argue that the potential terms in question were not actually "essential." But because we conclude that this issue is unpreserved, we need not detail the nature of the terms or address their absence further.

and a challenge to the adequacy of the court's findings, which "asserts that the court's findings did not adequately explain the basis for the court's rulings." *Cox v. Cox*, 2023 UT App 62, ¶ 32 n.5, 532 P.3d 128. This distinction matters, especially for purposes of preservation. *See In re K.F.*, 2009 UT 4, ¶ 61, 201 P.3d 985. A challenge to the sufficiency of the evidence need not be preserved because "[i]t would be superfluous to demand that a party challenge the evidentiary support for a court's findings shortly after the court articulates them." *Id.* But a challenge to the adequacy of the court's findings "is quite a different matter," and it is "wholly necessary for a party to challenge and thus afford the trial court an opportunity to correct the alleged error of inadequately detailed findings in order to provide for meaningful appellate review of the court's decision." *Id.* (quotation simplified). As our supreme court has explained, such differential treatment is grounded in "[j]udicial economy" concerns. *Id.* ¶ 63. It has noted:

> Not only is an error in the detail in the findings easy for a trial judge to correct, but it is an error that is best corrected when the judge's findings are fresh in the judge's mind. Further, it is a waste of judicial resources for an appellate court to entertain such a challenge when the only likely remedy is merely a remand to the trial court for more detailed findings. We decline to offer such a remedy unless the petitioner first provided the trial court the opportunity to correct the error.

*Id.*

¶35 In his opening brief, Mayne characterized this claim as being a challenge to "[t]he adequacy of the trial court's factual findings." And he further argued that, without such findings, the contract's terms would be left so "indefinite[]" that the contract could not be enforced. But to the extent that Mayne is challenging

the adequacy of the court's findings, such a claim could and should have been brought below so that the district court could correct it in the first instance.

¶36 Mayne nevertheless asserted in his brief that this claim was preserved by his counsel's oral argument to the district court on his motion for partial summary judgment. After members of this court raised the preservation issue during oral arguments on appeal, Mayne filed a supplemental brief in which he alleged that this claim was also preserved by his counsel's closing argument to the district court. But the summary judgment proceedings and the closing argument at trial all occurred before the district court issued its final ruling. As a result, these arguments would not have "afford[ed] the trial court an opportunity to correct the alleged error of inadequately detailed findings," *id.* ¶ 61 (quotation simplified), since the alleged error only occurred when the district court issued the allegedly infirm final judgment.

¶37 Indeed, in his supplemental brief, Mayne conceded that "no post-judgment motions were filed regarding the lack of definite terms necessary to create a valid and enforceable contract." And we note here that Mayne did file both an objection to the plaintiff's proposed final judgment, as well as a motion to alter or amend the judgment, but neither of these filings asked the district court to make additional findings on any of the terms at issue in this appellate argument.[8]

¶38 In short, because Mayne did not alert the court to the alleged error, much less ask the court to correct it, he "waived any

---

8. The objection argued that several specific factual findings in the final judgment were not consistent with the district court's oral ruling. And the motion to alter or amend asserted that "the Plaintiff's Proposed Judgment . . . errantly represented to the Court that the form of [the final judgment] had been agreed to and stipulated by Defendant's counsel, when it in fact had not."

argument regarding whether the district court's findings of fact were sufficiently detailed." *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 56, 99 P.3d 801. We therefore decline to address the merits of the argument.

### III. 1031 Exchange

¶39    Finally, Mayne claims that the district court erred in finding that he breached the oral agreement when he used the proceeds from the sale of the Tooele property in a 1031 exchange and failed to distribute any proceeds to Matt or Makay. We disagree.

¶40    The district court found that "Mayne offered to split the liquid proceeds as well as any proceeds derived from the real property equally among Matt, Makay, and Mayne." The district court then concluded that a "valid and enforceable contract exists between Matt, Makay, and Mayne for the equal distribution of proceeds upon the sale of land that passed from Larry's estate to Mayne." And the court further concluded that "Mayne breached that contract when he sold the Tooele property for $2 million and failed to distribute proceeds to Matt and Makay, or even inform them of the pending sale or closing."

¶41    In Mayne's view, the transactions in question did not trigger his obligations under this agreement because they constituted an exchange under section 1031 of the Internal Revenue Code, *see generally* 26 U.S.C. § 1031. But again, the agreement entitled Matt and Makay to any "proceeds derived from the real property." And there certainly were proceeds from the sale of the Tooele property—namely, $2 million. Mayne nevertheless points out that he arranged to have those proceeds held in escrow by his bank, which, in his view, matters because it meant that he didn't personally receive those funds. But nothing obligated him to do that, and Mayne could have changed his mind and accessed those funds. And although it's true that Mayne then used that money "to purchase new property in Juab County as

well as a condominium in Utah County," we note that each of these transactions involved separate real estate purchase contracts. And more to the point, the fact that Mayne chose to acquire new properties through a 1031 exchange doesn't mean that Matt and Makay were obligated to do the same with their share of the proceeds from the sale of the Tooele property.

¶42    Because Matt and Makay were entitled to share in any proceeds derived from the sale of the Tooele property, the district court committed no error when it concluded that Mayne breached the agreement by failing to distribute their shares to them before using the proceeds in the 1031 exchange.

CONCLUSION

¶43    Mayne has not persuaded us that the district court committed any error. We therefore affirm the district court's judgment.

———————